HOMER D. RABON v. ROWAN MEMORIAL HOSPITAL, INCORPORATED.

(Filed 20 January, 1967.)

**1. Torts § 1—**

Liability for tortious conduct is the general rule, immunity is the exception.

**2. Hospitals § 3—**

A nonprofit hospital is liable for negligent injury to a patient inflicted by a nurse in the discharge of her duties as an employee of the hospital. The doctrine of charitable immunity in such instance cannot be supported by logic or legal principles. However, in view of the fact that hospitals have relied upon the rule of immunity and may not have adequately protected themselves with liability insurance, the rule of liability applies only to this case and those causes arising subsequent to the rendition of this decision.

**3. Appeal and Error § 61—**

Our courts faithfully observe the doctrine of *stare decisis*, and especially in matters involving title to property, changes in the law may be made only by the General Assembly; nevertheless, the doctrine of *stare decisis* will not be applied to perpetuate a court-made rule which is palpably in error.

PLESS, J., dissents.

PARKER, C.J., dissenting.

LAKE, J., dissenting.

APPEAL by plaintiff from *Campbell, J.,* November-December 1965 Session of ROWAN, docketed in the Supreme Court as Case No. 606, and argued at the Spring Term 1966.

Action for damages for personal injuries.

Plaintiff alleges that, on December 21, 1959, he entered defendant Hospital as a paying patient for the treatment of an infection; that while he was there, a hospital nurse negligently injected penicillin or some other drug "into or adjacent to the radial nerve" in his left arm; and that the injection resulted in the permanent paralysis and loss of use of the arm and hand. There is no allegation that defendant failed to use due care in the selection and retention of the nurses who attended him. Defendant, answering, denies all allegations of negligence and alleges: (1) that it is a nonstock, nonprofit, charitable corporation organized and operated for the treatment of the sick and injured; (2) that it "is and always has been an institution of purely public charity for the purpose of rendering free hospital services to the sick and injured who are financially unable to pay for the same"; (3) that any profits arising from its revenues are put back into the hospital and used for the purposes for which it was incorporated; and (4) that as a charitable institution it is exempt by law from liability for injuries resulting from the negligent acts of its employees.

The parties agreed that defendant's allegations of charitable immunity should be treated as a plea in bar and determined by the judge without a jury. Judge Campbell heard the matter upon stipulations which included, *inter alia,* the following: (1) Patients are charged for services rendered on the basis of fixed schedules. (2) When bills are not paid the hospital undertakes to collect from patients, but it never undertakes to secure collections from an indigent person other than through charitable sources. (3) The hospital accepts indigent cases "indefinite in number and to the extent of available space" regardless of ability to pay — no one needing emergency treatment is denied hospitalization. (4) During the year 1959, defendant's scheduled charges for services rendered indigent patients certified by the Rowan County Welfare Department totaled $46,162.52, of which Rowan County paid only $32,505.48, the hospital absorbing the balance. Costs of services rendered to indigents who were not certified by the Welfare Department were borne by the hospital. (5) All funds received by the hospital from any source have at all times been used only to care for the sick and injured, including indigent persons.

Upon the stipulations, Judge Campbell found that Rowan Memorial Hospital has always been operated as "a nonprofit, community, voluntary hospital"; that in the year of plaintiff's alleged

injury (1959), defendant had income in excess of expenses; that the major share of its operating funds is derived from charges made for the care and treatment of paying patients; that no part of defendant Hospital's income in excess of expenses has ever been diverted to private gain, but all such funds are put back into the Hospital's resources. From these facts the court concluded that, "under and by authority of the case of *Williams v. Union County Hospital Association*, 234 N.C. 536, 67 S.E. 2d 662", defendant corporation is a charitable organization which cannot be held liable for injuries resulting to patients from the negligence of its employees. He thereupon dismissed the action, and plaintiff appealed.

*George L. Burke, Jr. and Archibald C. Rufty for plaintiff appellant.*
*Shuford, Kluttz and Hamlin for defendant appellee.*

SHARP, J.   This appeal presents only one question. Is defendant Hospital's plea of charitable immunity a valid defense to plaintiff's action? This Court has held that it is. In *Williams v. Hospital*, 237 N.C. 387, 389, 75 S.E. 2d 303, 304, it is said:

> "It is settled law in this jurisdiction that a charitable institution may not be held liable to a beneficiary of the charity for the negligence of its servants or employees if it has exercised due care in their selection and retention. *Barden v. R. R.*, 152 N.C. 318, 67 S.E. 971; *Hoke v. Glenn*, 167 N.C. 594, 83 S.E. 807; *Herndon v. Massey*, 217 N.C. 610, 8 S.E. 2d 914; *Johnson v. Hospital*, 196 N.C. 610, 146 S.E. 573; *Smith v. Duke University*, 219 N.C. 628, 14 S.E. 2d 643."

The specific question which *Williams* decided was that, under the above rule, both paying and nonpaying patients are "beneficiaries of the charity," a question left open in *Williams v. Hospital Asso.*, 234 N.C. 536, 67 S.E. 2d 662.

Decided cases indicate that the present state of the law in North Carolina is as follows: A patient, paying or nonpaying, who is injured by the negligence of an employee of a charitable hospital may recover damages from it only if it was negligent in the selection or retention of such employee, *Williams v. Hospital, supra, Williams v. Hospital Asso., supra,* or perhaps if it provided defective equipment or supplies. *Payne v. Garvey*, 264 N.C. 593, 142 S.E. 2d 159. A stranger (anyone who is not a beneficiary of the charity, *i. e.*, one other than a patient) who is injured by the negligence of *any* employee, however, may collect damages from the hospital. *Cowans v. Hospitals*, 197 N.C. 41, 147 S.E. 672. Nor does the fact

that a charitable institution has procured liability insurance affect its immunity. *Herndon v. Massey*, 217 N.C. 610, 8 S.E. 2d 914.

The decision in this case depends upon whether we shall continue to adhere to the rule so flatly enunciated in *Williams v. Hospital*, *supra*. Plaintiff, as have others before him, appeals for the specific purpose of requesting this Court to re-examine our rule in the light of current conditions, the tide of judicial decision elsewhere, and the general agreement among legal scholars that charitable immunity is insupportable. See Prosser, Torts § 127, n. 26 (3rd Ed. 1964) and *President and Directors of Georgetown College v. Hughes*, 130 F. 2d 810 (D. C. Cir.), note 2, where citations to such treatises are collected. We have, therefore, decided to review our position with reference to hospitals. In so doing we begin with the exhaustively documented opinion of Justice Wiley Rutledge (then a member of the United States Court of Appeals for the District of Columbia, later a member of the Supreme Court of the United States) in *President and Directors of Georgetown College v. Hughes, supra*. Although the plaintiff in *College v. Hughes* was a special nurse (stranger), the opinion encompassed the law of charitable immunity. Opinions written since this 1942 case have, with few exceptions, paid tribute to its penetrating analysis of the various theories upon which courts have upheld the doctrine of charitable immunity as applied to hospitals. So completely has this question been discussed and analyzed in that and succeeding cases that we recognize the futility of attempting "to gild refined gold, to paint the lily."

We commence, as did Justice Rutledge, by noting that liability for tortious conduct is the general rule; immunity is the exception, and charity is no common-law defense to tort. The grant of immunity from liability for the negligent acts of its servants to any charitable institution is an exception to the general principle of liability. *Noel v. Menninger Foundation*, 175 Kan. 751, 267 P. 2d 934; *Parker v. Port Huron Hospital*, 361 Mich. 1, 105 N.W. 2d 1; *Mississippi Baptist Hosp. v. Holmes*, 214 Miss. 906, 55 So. 2d 142; *Collopy v. Newark Eye & Ear Infirmary*, 27 N.J. 29, 241 A. 2d 276; *Pierce v. Yakima Valley Memorial Hospital Ass'n*, 43 Wash. 2d 162, 260 P. 2d 765; *Adkins v. St. Francis Hosp. of Charleston*, 143 S.E. 2d 154 (W. Va. Ct. App.); Harper, Torts § 81 (1933); 2 Restatement, Torts §§ 323-325 (1934). Private corporations are responsible for the actionable negligence of their agents as are individuals who are also responsible for their own negligence. The physician who undertakes to treat a charity patient and neglects him must respond in damages for his malpractice; a motorist whose negligence has caused injury to his guest passenger must likewise pay. "Whether the good Samaritan rides an ass, a Cadillac, or picks up hitchhikers in a

Model T, he must ride with forethought and caution. . . . Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing." *College v. Hughes, supra* at 813. A privately-owned hospital, operated by individual doctors who hope to make a profit but who render charitable service when necessary, must answer to a charity patient who has been injured by an employee. Yet today in North Carolina a laboratory technician employed by a public hospital may kill a patient with mismatched blood and the institution goes free. See *Davis v. Wilson,* 265 N.C. 139, 143 S.E. 2d 107. Such an anomaly, in the opinion of Justice Rutledge, could have arisen only fortuitously, for surely "the basis of the distinction cannot be charity." *College v. Hughes, supra* at 814.

The doctrine was first declared in this country in 1876, when the Supreme Court of Massachusetts held that a charity patient, negligently injured by a student doctor, could not hold the hospital responsible if due care had been used by its trustees "in the selection of their inferior agents." *McDonald v. Massachusetts General Hospital,* 120 Mass. 432, 21 Am. Rep. 529. The rationale of the decision was that the public and private donations which supported the charitable hospital constituted a trust fund which could not be diverted to damages. As its sole authority, the Massachusetts court relied upon the English case of *Holliday v. St. Leonard's, Shoreditch* (1861), 11 C.B. (ns) 192, 142 Eng. Rep. 769, which had denied recovery against the vestry of a parish for injury caused by a defect in a highway under its control. This ruling was in turn based on a dictum by Lord Cottenham in *Duncan v. Findlater* (1839), 6 Clark & Fin. 894, 7 Eng. Rep. 934 (a case involving the liability of highway trustees under a public road act *for negligence of third persons)* and his similar dictum in *Feoffees of Heriot's Hospital v. Ross* (1846), 12 Clark & Fin. 507, 513, 8 Eng. Rep. 1508, 1510: "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose." The *Heriot's Hospital* case did not involve personal injury but a wrongful exclusion from the benefits of the defendant charity. Soon after they were made, these rulings and Lord Cottenham's dicta were repudiated in England by the case of *Mersey Docks Trustees v. Gibbs* (1866) L.R. 1 H.L. 93, 11 Eng. Rep. 1500 and by *Foreman v. Mayor of Canterbury* (1871) L.R. 6 Q.B. 214. Thus, in holding a hospital not liable to a negligently injured charity patient, the Massachusetts court relied upon reasoning which had already been discredited. *College v. Hughes, supra* at 815-16. See *Noel v. Menninger Foundation, supra;*

*Parker v. Port Huron Hosp., supra; Bing v. Thunig,* 2 N.Y. 2d 656, 143 N.E. 2d 3, 163 N.Y.S. 2d 3; *Andrews v. Youngstown Osteopathic Hosp. Ass'n,* 77 Ohio L. Abs. 35, 147 N.E. 2d 645 (Ohio App.); *Avellone v. St. John's Hosp.,* 165 Ohio St. 467, 135 N.E. 2d 410; *Pierce v. Yakima Valley Memorial Hosp. Ass'n, supra;* Annot., Charity — Tort Liability — Immunity, 25 A.L.R. 2d 29, 38 (1952).

The rule in England today is that a hospital authority is liable for the negligence of its employees, including its doctors and nurses, without the necessity of alleging that any of them was not fully competent. *Cassidy v. Ministry of Health* (1951) 2 K.B. 343; 1 All E.R. 574 (see Comments on this case in 14 Mod. L. Rev. 504 (1951) and 17 Mod. L. Rev. 547 (1954); see also *College v. Hughes, supra* at 819). In 1885, Maryland, relying upon Massachusetts, adopted the rule of charitable immunity in *Perry v. House of Refuge,* 63 Md. 20, 52 Am. Rep. 495. Both courts apparently acted in ignorance of the English reversals. Thus "they resurrected in America a rule already dead in England, and thereby gave Lord Cottenham's dictum a new lease on life in the New World." *College v. Hughes, supra* at 816. *Accord, Noel v. Menninger Foundation, supra; Mississippi Baptist Hosp. v. Holmes, supra; Collopy v. Newark Eye & Ear Infirmary, supra; Bing v. Thunig, supra; Avellone v. St. John's Hosp., supra; Flagiello v. Pennsylvania Hosp.,* 417 Pa. 486, 208 A. 2d 193; *Pierce v. Yakima Valley Hosp., supra.*

In the meantime, Rhode Island, following the decision in *Mersey Docks v. Gibbs, supra,* had held a charitable hospital liable for negligent injuries inflicted upon a patient. *Glavin v. Rhode Island Hosp.,* 12 R.I. 411, 34 Am. Rep. 675. *Glavin* was the first decision in this country holding that a charitable hospital had the same liability for negligence as a private corporation. See *Durney v. St. Francis Hosp.,* 46 Del. 350, 83 A. 2d 753 (Del. Super. Ct.). In 1888, Pensylvania, also relying upon Lord Cottenham's repudiated pronouncements, and upon *McDonald v. Massachusetts Gen. Hosp., supra,* applied the charitable immunity doctrine to hospitals in the case of *Fire Ins. Patrol v. Boyd,* 120 Pa. 624, 15 Atl. 552, 1 L.R.A. 417. *Flagiello v. Pennsylvania Hosp., supra.* With reference to the origin of the doctrine of immunity, the Washington court said, in abandoning it:

> "Ordinarily when a court decides to modify or abandon a court-made rule of long standing, it starts out by saying that 'the reason for the rule no longer exists.' In this case, it is correct to say that the 'reason' originally given for the rule of immunity never did exist." *Pierce v. Yakima Valley Memorial Hosp., supra* at 167, 260 P. 2d at 768.

Ignoring Rhode Island and choosing to follow Massachusetts, Maryland, and Pennsylvania (then the weight of authority!), other courts adopted immunity, but not all of them based their decisions on the trust fund theory. In addition to (1) the trust fund theory, other rationales were: (2) one who enters a charitable hospital for treatment impliedly consents to assume the risk of negligent injuries by carefully selected servants and is deemed to have waived any claim for damages which he might otherwise have had against the institution; (3) the principle of *respondeat superior* is not applicable to charitable hospitals, for that (a) doctors and nurses, because of their skill, are independent contractors; (b) when the hospital tenders to a beneficiary a *competent* employee, he becomes the servant of the patient; (c) its employees bring it no profit; and (4) charitable institutions perform a vital public service and the public policy is to encourage donations and to protect them from tort claims which might cripple the charity. See Prosser, *op. cit. supra* § 127; *Mullikin v. Jewish Hospital Assn. of Louisville*, 348 S.W. 2d 930 (Ky. Ct. App.); *College v. Hughes, supra.*

In *Williams v. Hospital, supra* at 390, 75 S.E. 2d at 305, Johnson, J., summarized these theories with the comment that each "seems to be subject to some measure of meritorious criticism." We will review them in the order of our enumeration.

(1) *Trust fund theory.* This rationale is that charitable liability would misappropriate a donor's funds to purposes and to persons whom he did not intend to benefit, thereby dissipating the fund in damages. This approach assumes the donor's intent and supports only *total* immunity, but it has not been abandoned when courts have gone from total to qualified immunity. *College v. Hughes, supra* at 823. Can it logically be held that there would be a dissipation of funds when a patient is compensated for injuries negligently inflicted upon him by a carefully selected employee, but that there is no diversion when compensation is awarded a stranger or a patient negligently injured by an employee who was not selected with due care? Yet the North Carolina rule permits recovery in the second situation but denies it in the first. Damage suits by strangers to the charity's beneficence can be quite as serious and costly as those by patients. See *Avellone v. St. John's Hosp., supra; Mississippi Baptist Hosp. v. Holmes, supra.* The injustice of making a distinction between a charitable beneficiary and a stranger who has been negligently injured was pointed out in *College v. Hughes, supra* at 825:

> "To give it (compensation) to a stranger but not to a beneficiary makes the latter accept succor at the risk of greater

harm. When it occurs he bears a burden which should fall on all alike, not on him alone. On the other hand, no one has the right to have cure or care at the cost of harm inflicted upon another. To allow recovery to the beneficiary, but deny it to the stranger, would unload on the latter in some part not only the cost of care and cure, but the cost of injury to the former.

\*    \*    \*

". . . If the matter is regarded as 'diverting the fund to persons not within the class intended for aid,' it is impossible to assume that the donor intends everyone except the special object of his bounty to have reparation. If any assumption were justified, it would be exactly the contrary one."

It is a paradoxical argument that by refusing recovery to the victim of a hospital's negligence one is somehow serving charity. *Flagiello v. Pennsylvania Hosp., supra.* Indeed, if compensation is denied him, he or his family may well become dependent on some other charitable organization. Nor has experience justified the apprehension that if immunity is abolished, hospital funds will be dissipated in damages. Other courts have joined Justice Rutledge in discounting this fear:

"No statistical evidence has been presented to show that the mortality or crippling of charities has been greater in states which impose full or partial liability than where complete or substantially full immunity is given. Nor is there evidence that deterrence of donation has been greater in the former. Charities seem to survive and increase in both, with little apparent heed to whether they are liable for torts or difference in survival capacity.

"Further, if there is danger of dissipation, insurance is now available to guard against it and prudent management will provide the protection. . . . What is at stake, so far as the charity is concerned, is the cost of reasonable protection, the amount of the insurance premium as an added burden on its finances, not the awarding over in damages of its entire assets.

"Against this, we weigh the cost to the victim of bearing the full burden of his injury. . . . Also, as some of the more recent cases point out, much of modern charity or philanthropy is 'big business' in its field. It therefore has a capacity for absorption of loss which did not exist in the typical nineteenth century small hospital or college." *College v. Hughes, supra* at 823-24.

*Accord, Noel v. Menninger Foundation, supra; Myers v. Drozda,*
141 N.W. 2d 852 (Nebr.); *Avellone v. St. John's Hosp., supra; Ad-
kins v. St. Francis Hospital of Charleston, supra.*

In their treatise on torts, Harper and James say:

> "There is not the slightest indication that donations are dis-
> couraged or charities crippled in states which deny immunity.
> Contributors today assume that part of their gifts will go to de-
> fray administrative expenses and overhead. Liability insurance
> is available on reasonable terms to spread the risk and protect
> against financial disaster. Premiums represent a calculable and
> regular expense which is typically met by enterprises operating
> on the scale of today's hospital. . . ." 2 Harper and James,
> Torts § 29.16 (1956).

The most recent pronouncement discounting the danger of diversion
comes from the Supreme Court of Pennsylvania:

> "If havoc and financial chaos were inevitably to follow the
> abrogation of the immunity doctrine, as the advocates for its
> retention insist, this would certainly have become apparent in
> the states where that doctrine is no longer a defense. But neither
> the defendant hospital nor the Hospital Association of Pennsyl-
> vania *(amicus curiæ)* has submitted any evidence of catas-
> trophe in the states where charitable hospitals are tortiously
> liable." *Flagiello v. Pennsylvania Hosp., supra* at 503, 208 A.
> 2d at 201.

Charitable hospitals carry liability insurance to protect their en-
dowments and earnings against the consequences of their "corporate
or administrative negligence" in employing incompetent servants,
and against suits by strangers. It is equally available to protect
them from the consequences of suits by patients for employee neg-
ligence. "(P)remiums for such insurance can be paid as an item of
the cost of operation without unduly impairing their earnings for
use in the operation of their business." *Mississippi Baptist Hosp. v.
Holmes, supra* at 934, 55 So. 2d at 153.

(2) *Waiver.* The suggestion that a patient who enters a non-
profit hospital for treatment impliedly agrees that he will not seek
damages for any injuries suffered through the negligence of his bene-
factor's servants is a patent fiction which does violence to the facts.
To demonstrate its fallacy, one need only ask how an unconscious,
minor, irrational, or very ill patient could make a binding con-
tract, or be deemed to know "by intuition the legal principle of law
that the courts after years of travail have at last produced." *Ad-*

kins v. Hospital, supra; Ray v. Tucson Medical Center, 72 Ariz. 22, 230 P. 2d 220; Myers v. Drozda, supra. See Mississippi Baptist Hospital v. Holmes, supra. A patient goes to the hospital expecting expert care. If he were to be greeted with a request that he sign a waiver of his right to damages in the event of his negligent injury, the implication in that request would most certainly cause him to refuse, if he were in any condition to do so. Furthermore, the paying patient (whose "contributions" in many of the cited cases admittedly exceeded the cost of his hospital care) is certainly not an object of charity in the original concept of that term; yet the waiver theory has been applied to him as well as to the indigent patient. Wheat v. Idaho Falls Latter Day Saints Hospital, 78 Idaho 60, 297 P. 2d 1041. See also the dissenting opinion in Williams v. Hospital, supra.

(3) Non-applicability of the rule of respondeat superior. The theory that the principle of respondeat superior should not be applied to a charitable hospital if it has used due care in the selection of its doctors, nurses, attendants and other employees was the one adopted by the North Carolina court, Barden v. R. R., 152 N.C. 318, 67 S.E. 971, Hoke v. Glenn, 167 N.C. 594, 83 S.E. 807. It has never been suggested, however, that locomotive engineers, airplane pilots, electricians, and other skilled specialists are not agents of the corporation which employs them, or that their employer is relieved of liability for their negligence because their particular skills gave them the status of independent contractors. Furthermore, regularly employed hospital personnel are entitled to workmen's compensation when they are injured on the job. In no other context would it be suggested that salaried employees should be treated as independent contractors or as servants of those who contract with their employer, and there is no justification for such an anomaly here.

The Arizona court neatly disposed of the theory of non-applicability of respondeat superior as follows:

> "The question of whether the doctrine of respondeat superior applies in any given case depends upon whether the relation of master and servant exists at the time the tort was committed, not upon the relation of the injured person to the master. This being true, if a stranger may invoke the doctrine of respondeat superior it irresistibly follows that a so-called beneficiary, whether he be a paying or nonpaying patient, may likewise invoke it." Ray v. Tucson Medical Center, supra at 33, 230 P. 2d at 228.

Accord, Durney v. St. Francis Hospital, supra.

As the New York Court of Appeals so clearly pointed out, the

same considerations which brought *respondeat superior* into being apply to this situation:

> "Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness. It is not alone good morals but sound law that individuals and organizations should be just before they are generous, and there is no reason why that should not apply to charitable hospitals. . . . Insistence upon *respondeat superior* and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and law demand the exercise of care.
>
> "The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility.
>
> "Hospitals should, in short, shoulder the responsibilities borne by everyone else. There is no reason to continue their exemption from the universal rule of *respondeat superior*. The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees and, if he was, was he acting within the scope of his employment." *Bing v. Thunig, supra* at 666-67, 143 N.E. 2d at 8, 163 N.Y.S. 2d at 10-11.

Another suggestion, that the rule of *respondeat superior* does not apply because a hospital derives no gain from what its servant does, is untenable even if we assume its premise. Gain or profit has no rational relation to the doctrine of *respondeat superior*, which "rests upon the employment of the servant by the master and the master's right to exercise direction and control over his work in the conduct

of his business." *Ray v. Tucson Medical Center, supra* at 33, 230 P. 2d at 227.

There is a palpable and fundamental inconsistency in a rule such as ours which says that, if due care is exercised in the selection of an employee whose negligence has caused damage to a patient, the doctrine of *respondeat superior* does not apply and no liability attaches to the hospital, but that if due care has not been exercised in the selection, the doctrine of *respondeat superior* does apply and liability results. The actual tort-feasor is either an employee of the hospital acting within the scope of his employment, or he is not.

(4) *Public Policy.* The contention that charitable immunity serves public policy today was convincingly refuted by the Michigan court in *Parker v. Port Huron Hospital, supra:*

> "The immunity rule arose at a period in our society's development when charity typically operated on a small scale. Most gifts to charity were private, not corporate. Charitable needs were always poorly satisfied. It made sense in that period to hold that all gifts to charity should go to the purposes for which they were given, and not to outsiders who were by accident injured in the administration of the charity. This was a deliberate choice, designed to encourage gifts to charity by assuring the giver that his gift would be used as he intended.

> "Today charity is big business. It often is corporate both in the identity of the donor and in the identity of the donee who administers the charity. Tax deductions sometimes make it actually profitable for donors to give to charity. Organized corporate charity takes over large areas of social activity which otherwise would have to be handled by government, or even by private business. Charity today is a large-scale operation with salaries, costs and other expenses similar to business generally. It makes sense to say that this kind of charity should pay its own way, not only as to its office expenses but as to the expense of insurance to pay for torts as well.

> "The old rule of charitable immunity was justified in its time, on its own facts. Today we have a new set of facts.

> . . .

> "It is our conclusion that there is today no factual justification for immunity in a case such as this, and that principles of law, logic and intrinsic justice demand that the mantle of immunity be withdrawn. The almost unanimous view expressed in the recent decisions of our sister States is that insofar as the rule of immunity was ever justified, changed conditions have rendered the rule no longer necessary." 361 Mich. at 24-25, 105 N.W. 2d at 12-13.

*Accord, Myers v. Drozda, supra; Collopy v. Newark Eye & Ear Infirmary, supra; Pierce v. Yakima Valley Memorial Hospital Assn., supra; Kojis v. Doctors Hospital,* 12 Wisc. 2d 367, 107 N.W. 2d 131.

There can be little doubt that immunity fosters neglect and breeds irresponsibility, while liability promotes care and caution. *College v. Hughes, supra; Noel v. Menninger Foundation, supra; Mississippi Baptist Hosp. v. Holmes, supra; Sheehan v. North Country Hosp.,* 273 N.Y. 163, 7 N.E. 2d 29; 2 Harper and James, *op. cit. supra.* "Requiring hospitals to respond in damages for the carelessness of their employees provides the penalty which will insure the installation of safety methods and the enforcement of strict supervision over hospital personnel." *Flagiello v. Hospital, supra* at 496, 208 A. 2d at 198. Any member of the public may become a patient in a hospital at any moment; at some time in his life every person will probably require hospitalization. The public, therefore, is interested in having any hospital open to it safely equipped and properly conducted by carefully selected employees who perform their duties with due care. No court which has abolished charitable immunity as applied to hospitals has failed to acknowledge society's debt to the nonprofit, public hospital and to recognize its right to every benefit and assistance which the law can justly allow. When, however, a hospital tragedy results from the carelessness of an employee, the injustice of depriving the injured patient or his family of compensation in order to promote the impersonal cause of charity is apparent.

> "Neither the encouragement of charity and philanthropy nor the doctrine of immunity on the ground of public policy can dispel the fact that the primary interest and welfare of the public requires that one person should not suffer an injury to his or her life or limb without recompense merely in order that all of the earnings of a charitable hospital should be devoted to the purpose of providing charity for others." *Mississippi Baptist Hosp. v. Holmes, supra* at 939, 55 So. 2d at 156.

*Accord, Haynes v. Presbyterian Hosp. Assn.,* 241 Iowa 1269, 45 N.W. 2d 151; *Adkins v. Hosp., supra.*

In *Williams v. Hospital, supra,* this Court concluded that, no matter what the merits and demerits of charitable immunity as applied to hospitals, the doctrine was so deeply embedded in our common law that the court's withdrawal of it would constitute an act of judicial legislation in the field of public policy; that whether to change the rule was "a question of broad public policy to be pondered and resolved by the legislature." In support of this statement,

the court cited cases from Maryland, Michigan, New York, Oregon, Pennsylvania, Washington, and Massachusetts in which the courts of those states had expressed similar views and proclaimed fealty to the doctrine of *stare decisis* with fervor equal to, if not greater than, that of this Court. "At lovers' perjuries, they say Jove laughs," — of these seven states, only Maryland and Massachusetts now retain charitable immunity. The other five have, *by judicial decision,* abandoned it. The Maryland court has said that its legislature, by Md. Code Ann. § 48A-480, has accepted the doctrine announced in *Perry v. House of Refuge, supra.* This section provides that an insurer issuing a policy covering the liability of any charitable institution for tort is estopped from asserting the institution's defense of immunity. See *Howard v. South Baltimore General Hospital,* 191 Md. 617, 62 A. 2d 574. Thus, even Maryland does not follow our rule of *Herndon v. Massey, supra,* that procuring liability insurance does not affect immunity.

The first to abandon us was the Supreme Court of Washington which reversed its previous decisions upholding immunity only five months after *Williams v. Hospital* was decided. Said the court:

> "(H)aving now concluded that our court-declared policy is no longer valid, there seems to be no compelling reason why we must wait for legislative action. We closed our courtroom doors without legislative help, and we can likewise open them. It is not necessary that courts be slow to exercise a judicial function simply because they have been fast to exercise a legislative one.
> *   *   *
> "Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule." *Pierce v. Yakima Valley Memorial Hosp. Assn., supra* at 178-79, 260 P. 2d 765, 774 (1953).

When the Court of Appeals of New York abandoned charitable immunity, it had a ready answer to the argument that *stare decisis* compelled it to perpetuate charitable immunity until the legislature acted:

> "It *(stare decisis)* was intended, not to effect a 'petrifying rigidity' but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive and no principle constrains us to follow it. On the contrary . . . we would be abdicating 'our own function, in a field peculiarly nonstatutory' were we to insist on leg-

islation and 'refuse to reconsider an old and unsatisfactory court-made rule.'" *Bing v. Thunig, supra* at 667, 143 N.E. 2d at 9, 163 N.Y.S. 2d at 11.

*Accord, Mississippi Baptist Hosp. v. Holmes, supra; Myers v. Drozda, supra; Adkins v. Hosp., supra; Kojis v. Doctors Hosp., supra.*

Oregon, noting that the doctrine of charitable immunity was in general retreat elsewhere, its obsolescence well documented by judicial decision and by textwriters, abandoned the rule in 1963 in an opinion which dealt only with the issue of *stare decisis.*

> "(I)t is neither realistic nor consistent with the common law tradition to wait upon the legislature to correct an outmoded rule of case law. . . . Negligence law is common law. . . . The fact that a rule has been followed for fifty years is not a convincing reason why it must be followed for another fifty years if the reasons for the rule have ceased to exist. . . . Tort law in 1963 differs from tort law in 1863 for the most part because of the work of the courts. When courts have recognized the need for remedies for new injuries, the remedies have been found." *Hungerford v. Portland Sanatorium & Benev. Ass'n,* 235 Ore. 412, 414-15, 384 P. 2d 1009, 1010-11.

*Accord, Collopy v. Newark Eye & Ear Infirmary, supra.*

West Virginia, which formerly had the same rule of qualified immunity as stated in our case of *Williams v. Hospital, supra,* repudiated it in 1965 on the basis of *College v. Hughes, supra,* and the "deluge of decisions" which followed it. *"Stare decisis,"* it said, "is not a rule of law but is a matter of judicial policy. . . . In the rare case when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted. . . . It is better to be right than to be consistent with the errors of a hundred years." *Adkins v. Hosp., supra,* 143 S.E. 2d at 162. *Accord, Flagiello v. Penna. Hospital, supra,* the case in which Pennsylvania abandoned immunity.

The Michigan court, after paying tribute to the doctrine of *stare decisis* as one giving continuity to the rules by which men regulate their lives and conduct their business, abolished the charitable immunity of hospitals in 1960. *Parker v. Port Huron Hosp., supra.* In doing so it relied heavily upon *College v. Hughes,* and noted that seventeen jurisdictions had "abandoned whatever immunity they previously had" since that decision. The following year, relying upon *Parker v. Port Huron Hosp., supra,* Kentucky abandoned immunity

for unqualified liability. *Mullikin v. Jewish Hosp. Ass'n of Louis-ville, supra.*

Michigan's answer to the charge that a reversal of the rule of nonliability would be judicial legislation was:

> "(W)e can only say that the exception to the common law rule of *respondeat superior* was not, in this State, placed in our law by the legislature but by this Court. If we were to hold this exception to the rule in previous cases erroneous, we would only be determining what the law should have been in this State, except for the erroneous conclusion reached in the line of cases relied upon by defendant hospital." *Parker v. Port Huron Hosp., supra* at 11, 105 N.W. 2d at 6.

To protect any nonprofit hospital corporations which might "have failed to protect themselves by the purchase of available insurance," the Michigan court gave the new rule of liability no retroactive effect but limited it to that particular case and to causes of action arising after the date on which the opinion was filed. In adopting this method it said:

> "There can be no question of the right of this Court to make the application of the new doctrine prospective or retroactive. See discussion in opinion of Justice Cardozo in *Great Northern Railway Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364-366, 53 S. Ct. 145, 148, 77 L. Ed. 360, 366." *Id.* at 26, 105 N.W. 2d at 13.

See also the concurring opinion of Mr. Justice Frankfurter in *Griffin v. People of State of Illinois,* 351 U.S. 12, 25, 26, 76 S. Ct. 585, 593, 100 L. Ed. 891, 900; Levy, Realist Jurisprudence and Prospective Overruling, 109 U. Pa. L. Rev. 1 (1960). The Illinois court likewise gave only prospective effect to its decision holding that a charitable corporation may not limit its liability for tort to the amount of its liability insurance. *Darling v. Charleston Community Memorial Hospital,* 33 Ill. 2d 326, 211 N.E. 2d 253 (1965). The Nebraska court also followed this procedure when it changed its rule in *Myers v. Drozda, supra.* In *Kojis v. Doctors Hosp., supra,* the Supreme Court of Wisconsin overruled its prior decisions to hold that a charitable hospital was not immune from liability to a paying patient injured by the negligence of its employees. Twenty-four days later, on February 2, 1961, for the reasons stated in *Parker v. Port Huron Hosp., supra,* it limited the new rule to the *Kojis* case and to cases arising thereafter.

So far as our research has revealed, all but three jurisdictions in the United States (Hawaii, New Mexico and South Dakota) have

considered the question whether a hospital which is not operated for private gain is liable for injuries caused a patient by the negligence of its employees. Attempts have been made from time to time to catalogue the results of the decisions, which in 1942, ran the gamut "from full immunity, through varied but inconsistent qualifications, to general responsibility," according to Justice Rutledge. Since then, "the general retreat" from immunity has quickly outdated any tabulation.

Our research indicates that, at the present time, the states and territories are grouped as follows on the question of liability:

(1) *States retaining the rule of full immunity:* ARKANSAS, *Helton v. Sisters of Mercy of St. Joseph Hosp.,* 234 Ark. 76, 351 S.W. 2d 129 (and see Ark. Stat. Ann. § 66-4913); MAINE, *Jensen v. Maine Eye & Ear Infirmary,* 107 Me. 408, 78 Atl. 898; MARYLAND, *Perry v. House of Refuge,* 63 Md. 20, 52 Am. Rep. 495; *Cornelius v. Sinai Hosp.,* 219 Md. 116, 148 A. 2d 567 (but see Md. Code Ann. § 48A-480, which provides that insurers of such associations are estopped to assert the defense); MISSOURI, *Schulte v. Missionaries of La-Salette Corp.,* 352 S.W. 2d 636 (Mo. Sup. Ct.); *Dille v. St. Luke's Hosp.,* 355 Mo. 436, 196 S.W. 2d 615; MASSACHUSETTS, *McDonald v. Massachusetts Gen. Hosp.,* 120 Mass. 432, 21 Am. Rep. 529; *Mastrangelo v. Maverick Dispensary,* 330 Mass. 708, 115 N.E. 2d 455; RHODE ISLAND, R. I. Gen. Laws § 7-1-22; SOUTH CAROLINA, *Lindler v. Columbia Hosp.,* 98 S.C. 25, 81 S.E. 512.

(2) *Jurisdictions in which immunity is qualified, as indicated:* COLORADO, *St. Luke's Hosp. Ass'n v. Long,* 125 Colo. 25, 240 P. 2d 917; *O'Connor v. Boulder Sanitarium Ass'n,* 105 Colo. 259, 96 P. 2d 835 (charity is substantively liable, but charitable assets exempt from execution); CONNECTICUT, *Cohen v. General Hosp. Soc'y,* 113 Conn. 188, 154 Atl. 435; *Hearns v. Waterbury Hosp.,* 66 Conn. 98, 33 Atl. 595 (liable to strangers, but liable to patients only for "corporate negligence," *i. e.,* in the selection or retention of employees); DISTRICT OF COLUMBIA, *President and Directors of Georgetown College v. Hughes,* 130 F. 2d 810 (D.C. Cir.) (stranger); *White v. Providence Hosp.,* 80 F. Supp. 76 (D.D.C.) (paying patient's action dismissed for failure to allege corporate negligence,); GEORGIA, *Morton v. Savannah Hosp.,* 148 Ga. 438, 96 S.E. 887; *Cox v. DeJarnett,* 104 Ga. App. 664, 123 S.E. 2d 16; *Executive Comm. of the Baptist Convention v. Ferguson,* 95 Ga. App. 393, 98 S.E. 2d 50 (immunity in all cases waived to extent of liability insurance coverage. Beyond this, hospital is liable to strangers, employees, and all patients for corporate negligence; liable further to *paying* patients for *employee* negligence, but charitable assets exempt from execution); INDIANA, *St. Vincent's Hosp. v. Stine,* 195 Ind. 350, 144 N.E. 537 (liable to

strangers, but to patients only for corporate negligence). But see *Ball Memorial Hosp. v. Freeman*, 196 N.E. 2d 274 (Ind. Sup. Ct.), a 1964 case containing dicta suggesting that Indiana may be about to depart from its immunity rule as applied to charitable hospitals; LOUISIANA, *D'Antoni v. Sara Mayo Hosp.*, 144 So. 2d 643 (La. Ct. App.); *Bougon v. Volunteers of America*, 151 So. 797 (La. Ct. App.); *Jordan v. Touro Infirmary*, 123 So. 726 (La. Ct. App.) (liable to strangers, but to patient only for "corporate negligence." But see La. Rev. Stat. Ann. § 22:655, authorizing direct action against charity's insurer, who cannot claim the defense); NEW JERSEY, N. J. Stat. Ann. §§ 2A:53A-7 and -8 (charitable hospitals liable to patients for employee negligence to extent of $10,000.00; other charities liable only to non-beneficiaries of the charity); NORTH CAROLINA, *Williams v. Hosp.*, 237 N.C. 387, 75 S.E. 2d 303; *Cowans v. Hosp.*, 197 N.C. 41, 147 S.E. 672 (liable to patients only for "corporate negligence," but rule assumes full liability to non-patients); TENNESSEE, *Baptist Memorial Hosp. v. Couillens*, 176 Tenn. 300, 140 S.W. 2d 1088; *McLeod v. St. Thomas Hosp.*, 170 Tenn. 423, 95 S.W. 2d 917 (hospitals substantively liable, but charitable assets exempt from execution); TEXAS, *Baptist Memorial Hosp. v. McTighe*, 303 S.W. 2d 446 (Tex. Civ. App.); *Medical & Surgical Memorial Hosp. v. Cauthorn*, 229 S.W. 2d 932 (Tex. Civ. App.) (immune to any plaintiff absent "corporate negligence" in selection or retention of employees or in supplying defective equipment. See, however, the recent case of *Watkins v. Southcrest Baptist Church*, 399 S.W. 2d 530 (Texas, 1966), where 5 of the 9 justices expressed their dissatisfaction with the present Texas rule and served unmistakable warning that they will soon adopt the rule of total liability.); VIRGINIA, *Norfolk Protestant Hosp. v. Plunckett*, 162 Va. 151, 173 S.E. 363; *Memorial Hosp. v. Oakes*, 200 Va. 878, 108 S.E. 388; *Hospital of St. Vincent of Paul v. Thompson*, 116 Va. 101, 81 S.E. 13 (liable to strangers, but to patients only for "corporate negligence"); WYOMING, *Bishop Randall Hosp. v. Hartley*, 24 Wyo. 408, 160 Pac. 385 (liable to patients only for "corporate negligence").

(3) *Jurisdictions in which rule of immunity appears to have been rejected altogether:* ALABAMA, *Alabama Baptist Hosp. Bd. v. Carter*, 226 Ala. 109, 145 So. 443; *Tucker v. Mobile Infirmary Ass'n*, 191 Ala. 572, 68 So. 4 (liability to charity patient not discussed); ALASKA, *Moats v. Sisters of Charity of Providence*, 13 Alaska 546; *Tuengel v. Sitka*, 118 F. Supp. 399 (D. C. Alaska); ARIZONA, *Ray v. Tucson Medical Center*, 72 Ariz. 22, 230 P. 2d 220; CALIFORNIA, *Malloy v. Fong*, 37 Cal. 2d 356, 232 P. 2d 241; DELAWARE, *Durney v. St. Francis Hosp.*, 46 Dela. 350, 83 A. 2d 753 (Dela. Super. Ct.); FLORIDA, *Nicholson v. Good Samaritan Hosp.*,

145 Fla. 360, 199 So. 344; IDAHO, *Wheat v. Idaho Falls Latter Day Saints Hosp.,* 78 Idaho 60, 297 P. 2d 1041 (involving paying patient; liability to charity patient not discussed); ILLINOIS, *Darling v. Charleston Community Memorial Hosp.,* 33 Ill. 2d 326, 211 N.E. 2d 253; IOWA, *Haynes v. Presbyterian Hosp.,* 241 Iowa 1269, 45 N.W. 2d 151; KANSAS, *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P. 2d 934 (later statute restoring immunity by exempting charitable assets from execution, Kansas Gen. Stat. Ann. § 17-1725, held unconstitutional in *Neely v. St. Francis Hosp. & School of Nursing,* 192 Kan. 716, 391 P. 2d 155); KENTUCKY, *Mullikin v. Jewish Hosp. Ass'n,* 348 S.W. 2d 930 (Ky. Ct. App.); MICHIGAN, *Parker v. Port Huron Hosp.,* 361 Mich. 1, 105 N.W. 2d 1; MINNESOTA, *Mulliner v. Evangelischer Diakonniessenverein,* 144 Minn. 392, 175 N.W. 699; MISSISSIPPI, *Mississippi Baptist Hosp. v. Holmes,* 214 Miss. 906, 55 So. 2d 142 (involved paying patient, but opinion suggests that liability will be rule in all cases); MONTANA, *Howard v. Sisters of Charity,* 193 F. Supp. 191 (D. Mont.) (no state court cases, but Federal Court purported to apply Montana law.); NEBRASKA, *Myers v. Drozda,* 141 N.W. 2d 852 (Nebr. Sup. Ct.); NEVADA, Nev. Rev. Stat. § 41.480; NEW HAMPSHIRE, *Welch v. Fisbie Memorial Hosp.,* 90 N.H. 337, 9 A. 2d 761; NEW YORK, *Bing v. Thunig,* 2 N.Y. 2d 656, 143 N.E. 2d 3, 163 N.Y.S. 2d 3; NORTH DAKOTA, *Rickbeil v. Grafton Deaconess Hosp.,* 74 N.D. 525, 23 N.W. 2d 247; OHIO, *Avellone v. St. John's Hosp.,* 165 Ohio St. 467, 135 N.E. 2d 410 (immunity totally rejected only as to hospitals; other charities retain qualified immunity); *Tomasello v. Hoban,* 6 Ohio Ops. 2d 508, 155 N.E. 2d 82); OKLAHOMA, *Sisters of the Sorrowful Mother v. Zeidler,* 183 Okla. 454, 82 P. 2d 996 (involved paying patient; liability to charity patient not discussed); OREGON, *Hungerford v. Portland Sanitarium & Benevolent Ass'n,* 235 Ore. 412, 384 P. 2d 1009; PENNSYLVANIA, *Flagiello v. Pennsylvania Hosp.,* 417 Pa. 486, 208 A. 2d 193 (involved paying patient, but opinions suggest liability will be rule in all cases); UTAH, *Sessions v. Thomas D. Dee Memorial Hosp.,* 94 Utah 460, 78 P. 2d 645 (involving paying patient); VERMONT, *Foster v. Roman Catholic Diocese,* 116 Vt. 124, 70 A. 2d 230, 25 A.L.R. 2d 1; WASHINGTON, *Pierce v. Yakima Valley Memorial Hosp. Ass'n,* 43 Wash. 2d 162, 260 P. 2d 765 (involved paying patient, but opinion suggests that liability will be rule in all cases); WEST VIRGINIA, *Adkins v. St. Francis Hosp.,* 149 W. Va. 705, 143 S.E. 2d 154 (W. Va. Ct. App.); WISCONSIN, *Kojis v. Doctors Hosp.,* 12 Wis. 2d 367, 107 N.W. 2d 131 (involving paying patient); PUERTO RICO, *Tavarez v. San Juan Lodge,* 68 P.R. 681.

It thus appears that seven states retain the rule of immunity sub-

stantially unqualified. Twelve jurisdictions recognize the rule with varying qualifications, whereas thirty others either have rejected it outright or have applied the rule of liability for injuries to paying patients in language which justifies the conclusion that the hospital would likewise be held liable to *any* negligently injured patient. No clear authority has been found from the states of Hawaii, New Mexico, or South Dakota. See, however, *Ulvig v. McKennan Hosp.,* 56 S.D. 509, 229 N.W. 383, where an action in tort against a "general" hospital was recognized. The opinion does not reveal whether or not the defendant was a *charitable* hospital, and the doctrine of immunity was not discussed. See Note, 3 S. Dak. L. Rev. 182. The question must also be regarded as undecided in New Mexico. A federal court sitting in that state held, in *Deming Ladies' Hosp. Ass'n v. Price,* 276 Fed. 668 (8th Cir.), that the charity was immune, absent corporate negligence. This case was decided prior to *Erie R. Co. v. Tompkins,* 304 U.S. 64, 82 L. Ed. 118, 58 S. Ct. 817, 114 A.L.R. 1487, however, and is thus no longer controlling even in the court which decided it.

Our research indicates that of the thirty jurisdictions apparently imposing full liability upon charitable hospitals for the actionable negligence of their employees, eighteen abandoned immunity by overruling their prior decisions. Only one state — Nevada — has repudiated the rule by statute. "The overwhelming numerical weight of authority" which bolstered this Court's decisions in the *Williams* cases has shifted to the other side.

This Court has never overruled its decisions lightly. No court has been more faithful to *stare decisis.* In matters involving title to property, its policy has been to leave changes in the law to the legislature. And always it has recognized "the gravity of the proposition that we shall reverse a decision of this court" as Connor, J., said in *Mial v. Ellington,* 134 N.C. 131, 139, 46 S.E. 961, 963-64, reversing *Hoke v. Henderson,* 15 N.C. 1. Nevertheless, when the duty has seemed clear, it has done so, recognizing that the membership of succeeding courts may well regard its membership as no less fallible. A majority of the Court had no hesitancy in abandoning a ruling which it had made in a 1925 criminal case when, in 1963, it became convinced that the ruling was erroneous and that injustices were resulting from it. See *State v. Blackmon,* 260 N.C. 352, 132 S.E. 2d 880, *overruling State v. Swindell,* 189 N.C. 151, 126 S.E. 417 and *State v. Cain,* 209 N.C. 275, 183 S.E. 300. We should be no less willing to overturn, for the same reason, a decision in a civil case. As Stacy, J. (later C.J.), said in *Spitzer v. Comrs.,* 188 N.C. 30, 32, 123 S.E. 636, 638: "There is no virtue in sinning against light or in

persisting in palpable error, for nothing is settled until it is settled right." Almost a quarter of a century later, Ervin, J., said: "The doctrine of *stare decisis* will not be applied in any event to preserve and perpetuate error and grievous wrong." *State v. Ballance*, 229 N.C. 764, 767, 51 S.E. 2d 731.

To hold that defendant Hospital can be held liable to plaintiff here, it is not necessary to discard the doctrine of charitable immunity as applied to churches, orphanages, rescue missions, transient homes for the indigent, and other similar institutions which remain charitable institutions in fact, for Rowan Memorial Hospital is not a charitable institution. The court's conclusion of law that it is a charitable organization is not supported by the stipulations nor the facts found. Even though public hospitals are not operated for private gain, every effort is made to operate them at a profit, which is put back into the facility. Nor are such hospitals principally supported by donations. Paying patients contribute largely to their support and maintenance — they provide the major share of defendant's operating funds. Furthermore, large payments in behalf of charity patients are made by governmental agencies from public funds. In short, to-day, some person or agency *pays* for the services a hospital renders. The hospital has lost its status as a charitable institution; a true charity requires no *quid pro quo* from its beneficiaries.

Convinced that the rule of charitable immunity can no longer properly be applied to hospitals, we hereby overrule *Williams v. Hospital*, 237 N.C. 387, 75 S.E. 2d 303, *Williams v. Hospital Asso.*, 234 N.C. 536, 67 S.E. 2d 662, and other cases of similar import. We hold that defendant Hospital is liable for the negligence of its employees acting within the scope and course of their employment just as is any other corporate employer. Recognizing, however, that hospitals have relied upon the old rule of immunity and that they may not have adequately protected themselves with liability insurance, we follow the procedure of Michigan, Illinois, Nebraska, and Wisconsin, as detailed in the decisions previously noted. The rule of liability herein announced applies only to this case and to those causes of action arising after January 20, 1967, the filing date of this opinion.

With reference to this case, we point out that it is now only in the pleading stage. Whether plaintiff can ultimately recover remains to be seen.

Reversed.

Pless, J., dissents.

PARKER, C.J., dissenting: It has been settled law in this juris-
diction by a uniform line of decisions for more than fifty-five years
that a charitable institution may not be held liable to a beneficiary
of the charity for the negligence of its servants or employees if it
has exercised due care in their selection and retention. *Williams v.
Hospital,* 237 N.C. 387, 75 S.E. 2d 303; *Williams v. Hospital Asso.,*
234 N.C. 536, 67 S.E. 2d 662; *Smith v. Duke University,* 219 N.C.
628, 14 S.E. 2d 643; *Herndon v. Massey,* 217 N.C. 610, 8 S.E. 2d
914; *Cowans v. Hospitals,* 197 N.C. 41, 147 S.E. 672; *Johnson v.
Hospital,* 196 N.C. 610, 146 S.E. 573; *Hoke v. Glenn,* 167 N.C. 594,
83 S.E. 807; *Barden v. R. R.,* 152 N.C. 318, 67 S.E. 971, 49 L.R.A.
N.S. 801; Anno: 109 A.L.R. 1199. Today, by a divided vote of four
to three this Court abolishes the doctrine of charitable immunity.

There are strong arguments in favor of the retention of the doc-
trine of charitable immunity; there are also strong arguments in
favor of its extinction. See Dickinson Law Review, Vol. 66-67, 1961-
63, p. 226 *et seq.*

Justice Sharp in the majority opinion has very forcibly set forth
arguments in favor of the extinction of the doctrine of charitable
immunity.

In *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A. 2d
193 (1965), the Supreme Court of Pennsylvania, by a vote of five
to two, abolished the doctrine of charitable immunity in Pennsyl-
vania. Chief Justice Bell in his dissenting opinion set forth strong
arguments in favor of the retention of the doctrine of charitable
immunity. He said:

> "(1) Hospitals and public charities are, next to the Church,
> the greatest benefactors known to mankind. They are in real-
> ity a Trust for Humanity. The majority Opinion would bring
> so much harm to nonprofit hospitals and so greatly increase hos-
> pital expenses, and likewise the already colossal cost to pa-
> tients, as to (a) harm all patients for the benefit of an injured
> few, and (b) jeopardize the existence of a number of hospitals,
> or (c) require them to reduce or greatly curtail or eliminate a
> number of their essential services and their functions, facilities,
> research and other activities and benevolences. Most hospitals
> in metropolitan areas operate in the red when their costs and
> expenses include depreciation, amortization and interest. For
> the benefit of a few really injured and many imaginatively-in-
> jured people . . . the lame, the halt and the blind, the poor,
> the sick, the ill, the needy, and the general public will be de-
> prived of the best services which a hospital can and should pro-
> vide. Moreover, new buildings, modern equipment, more and

better qualified personnel and increased wages will become more and more difficult if not impossible for most charities.

"(2) By eliminating charitable immunity for nonprofit, charitable hospitals, the majority Opinion likewise abolishes it for Churches, schools and universities, homes for the blind, homes for the aged, homes for crippled or retarded or homeless children, Catholic Home Shelter and five other Catholic child-care institutions in Philadelphia, convents, religious organizations of many denominations, the Salvation Army, the Y.M.C.A., and in short for every other charity — small as well as large — and will undoubtedly jeopardize, especially in small communities, the very existence of many of them which today, in spite of State and City aid and large charitable gifts, are barely able to make both ends meet.

"(3) The majority Opinion places the interests of a few individuals above the vital interests of the needy and ill public.

"(4) The majority Opinion changes, without any legal or even social justification and with tremendous resulting harm to the public, the public policy of this Commonwealth which has existed for three-quarters of a century and which has been repeatedly and recently reiterated by our Courts."

The majority opinion in this case cites with approval the majority opinion in the *Flagiello* case.

It may well be that the time has come to re-examine the reasons which caused the creation of the doctrine of charitable immunity, and to determine, under present day conditions, whether this doctrine should be retained or abolished. Mr. Justice Jones said in a dissenting opinion in the *Flagiello* case: "However, although fully cognizant that this doctrine is 'judge made' law created by judicial, not legislative, fiat, in my opinion, this doctrine has become part of the public policy of this Commonwealth, a public policy which, if it is to be changed, should be effected by legislative action." I agree with that statement.

I do not agree with the statement in the majority opinion that the trial court's conclusion of law that Rowan Memorial Hospital, Inc., is a charitable institution is not supported by the stipulations nor the facts found. The majority opinion states in effect that the tide of judicial decisions is in favor of the extinction of charitable immunity. In some of the courts extinguishing the doctrine of charitable immunity it seems to me that the tide is also flowing in favor of the extinction in a large measure of the doctrine of *stare decisis*. Chief Justice Bell, in his dissenting opinion in the *Flagiello* case,

states in effect that it would appear in Pennsylvania that the principle of *stare decisis* "is not dying, but dead."

Public policy considerations will necessarily come to bear on the ultimate fate of charitable immunity. There is no class of institutions more favored and encouraged by our people as a whole than those devoted to religious or charitable causes. Quoting again from Chief Justice Bell's dissenting opinion: "Public-minded benefactors are not likely to have their generous impulses encouraged if advised that some janitor, watchman or other employe of a charitable organization who carelessly fails to note the displacement of a brick or stone in a pavement may thereby bring about the loss of all the property and funds which the donors had sought to devote to the common good." It may be that the extinction of the charitable immunity doctrine may affect adversely and seriously all hospitals and charitable institutions throughout the State, and the impact of such extinction is a matter of grave concern.

This article from the Associated Press was carried in some of the daily papers of the State on Sunday, 7 October 1966.

"CHARLOTTE (AP) — The North Carolina Hospital Association will ask the 1967 General Assembly to pay hospitals the full cost of caring for charity patients, association officials said Friday.

"But the request will not result in any dramatic increase in the State's bill for charity hospitalization, insisted John Ketner, the association's assistant executive director.

"Because Medicare is paying the hospital bills of more than half the State's charity patients, the association figures that increased costs under the plan will total $483,881 for the two-year period, Ketner said.

"If the increase is approved, Ketner said it would eliminate the need for county supplements to help hospitals meet the costs of caring for charity patients."

The General Assembly is the ultimate tribunal to determine public policy. Members of the General Assembly coming from all parts of the State are in a better position than we are to hear evidence and to determine what effect the extinction of charitable immunity would have upon the charitable institutions of this State, and to decide whether charitable immunity should be retained or abolished, than a bare majority of this Court. I believe that the General Assembly and not this Court should determine whether the doctrine of charitable immunity should be retained or extinguished.

The majority opinion states: "The rule of liability herein an-

nounced applies only to this case and to those causes of action arising after January 20, 1967, the filing date of this opinion." In my opinion, this prospective judicial action is outright legislation by the Court.

Mr. Justice Frankfurter, in his concurring opinion in *Green v. United States,* 356 U.S. 165, 192 (1958) said: "To be sure, it is never too late for this Court to correct *a misconception in an occasional decision, even on a rare occasion* to change a rule of law that may have long persisted but also have long been questioned *and only fluctuatingly applied.* To say that everybody on the Court has been wrong for 150 years and that that which has been deemed part of the bone and sinew of the law should now be extirpated is quite another thing. . . . *The admonition of Mr. Justice Brandeis that we are not a third branch of the Legislature should never be disregarded.*" (Italics mine.)

LAKE, J., dissenting: If this were a case of first impression in this Court, I should be inclined, except as noted below, to concur in the result in the exceedingly well reasoned opinion of the majority. If I were a member of the Legislature, I should find it most persuasive upon the question of the adoption of a bill to make such a change in the law of this State. Since neither of those conditions prevails, I dissent.

If the majority opinion is otherwise sound, I find no basis in its reasoning, or in the authorities which it cites, for making a distinction between a nonprofit, charitable hospital corporation and any other nonprofit, charitable corporation with respect to the liability of such corporation for injury to a recipient of its services caused by the negligence of its employee in the course of that employee's duties. However, the basis for my dissent concerns an aspect of the majority opinion which is of much more far reaching importance to the people of this State than the mere determination of the right of a patient in such a hospital to recover damages for an injury caused by the negligence of such an employee. I shall, therefore, briefly state the reason I cannot concur in this decision.

Clearly, the availability at this time of liability insurance is immaterial upon the question of whether liability shall be decreed by us to exist from this date forward. The existence or nonexistence of a legal duty, and of liability to damages caused by the breach of that duty, surely cannot turn upon whether hospitals in general, or this defendant in particular, may now elect between paying for such losses as they occur or paying for them (plus a profit to an insurance company) in advance through insurance premiums.

The gist of the decision now reached by the majority is:

"Decided cases indicate that the *present* state of the law in North Carolina is as follows: A patient, paying or nonpaying, who is injured by the negligence of an employee of a charitable hospital may recover damages from it only if it was negligent in the *selection* or *retention* of such employee. * * * Convinced that the rule of charitable immunity *should no longer* be applied to hospitals, we hereby overrule *Williams v. Hospital* * * * and our other cases of similar import * * * The rule of liability herein announced applies only to this case and to those causes of action arising *after* * * * the filing date of this opinion." (Emphasis mine.)

In support of this decision, the majority quote with approval the opinion of the Supreme Court of Michigan in *Parker . v. Hospital*, 361 Mich. 1, 105 N.W. 2d 1, as follows:

"The old rule of charitable immunity was justified in its time, on its own facts. Today we have a new set of facts. * * * [C]hanged conditions have rendered the rule no longer necessary."

The Constitution of North Carolina contains these important provisions:

"A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." (Article I, § 29.)

"The legislative, executive and supreme judicial powers of the government ought to be forever separate and distinct from each other." (Article I, § 8.)

"The legislative authority shall be vested in two distinct branches, both dependent on the people, to wit: A Senate and a House of Representatives." (Article II, § 1.)

It cannot be doubted that the authority to determine that, by reason of changed conditions, that which was the law yesterday ought not to be the law tomorrow is "legislative authority." So, a declaration that in future litigation the courts shall hold that one who does a certain act tomorrow morning shall be liable in damages, but that one who did the same act last night shall not be liable in damages is an exercise of "legislative authority." The Constitution of this State expressly declares that *"the* legislative authority" shall be vested in the Legislature. (Emphasis mine.) This provision, taken together with Article I, § 8, *supra,* means that this Court has no legislative authority. It is for the people of North Carolina to

determine which of their agencies shall exercise which of their governmental powers. They have done so in language which seems to me inescapably clear.

The majority opinion, via a quotation from the Supreme Court of Michigan in *Parker v. Hospital, supra,* appears to cite Mr. Justice Cardozo in support of its view that this Court may properly declare that tomorrow morning the substantive law of North Carolina shall be the opposite of what it was last night. A reading of the opinion of that great jurist and legal philosopher in *Great Northern Railway Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S. Ct. 145, 77 L. ed. 360 (the case cited by the Michigan Court) discloses that the Michigan Court, and hence the majority of this Court, misconstrued Judge Cardozo's views there expressed. In that case, the Supreme Court of the United States was passing upon the single contention that the United States Constitution had been violated by a decision of the Supreme Court of Montana refusing to give retroactive effect to the overruling of its former decision. What Mr. Justice Cardozo there said was:

> "This is a case where a court has refused to make its ruling retroactive and the novel stand is taken that the Constitution of the United States is infringed by the refusal. We think the Federal Constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward."

I agree completely with this declaration by this wise interpreter of the Constitution of the United States that a decree of the Supreme Court of North Carolina, in a case like the present, to the effect that the law of North Carolina tomorrow shall be different from what it was yesterday violates no provision of the United States Constitution, and so is not properly a matter of concern to the Supreme Court of the United States. That, however, is a far cry from holding that the Constitution of North Carolina permits us to render such a decision.

The construction of our Constitution by this Court cannot be foreclosed by decisions of the Supreme Courts of Michigan, Illinois, Nebraska and Wisconsin, concerning their own authority under the constitutions of those states. Nor can it be foreclosed by a determination by the Supreme Court of the United States that it has a like power in its construction of the United States Constitution. See *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694.

Again, the majority opinion quotes, with approval, this state-

ment from the opinion of the Supreme Court of Oregon in *Hungerford v. Benevolent Association,* 235 Ore. 412, 414-15, 384 P. 2d 1009, 1010-11:

> "Negligence law is common law. * * * The fact that a rule has been followed for fifty years is not a convincing reason why it must be followed for another fifty years if the reasons for the rule have ceased to exist. * * * When courts have recognized the need for remedies for *new* injuries, the remedies have been found." (Emphasis mine.)

In the first place, the present decision is not an allowance of a remedy for a new type of injury. The injury of which the present plaintiff complains is exactly the same kind of injury suffered by the plaintiffs in the cases before this Court when it was determined that the law of North Carolina provided no remedy because there had been no violation of a legal duty; that is, the plaintiffs had sustained no *legal* injury. Those plaintiffs were denied liability upon the application of the maxim *dammum absque injuria.* The present decision is, therefore, not an invention of a new remedy for a new kind of damage or for a new kind of act or omission. It is simply a holding that a set of facts which yesterday gave rise to no legal right in anyone, except Henry Rabon, will tomorrow give a legal right to anyone so damaged. Under this decision, of all the persons injured heretofore in hospitals by the negligence of a nurse, carefully selected by her employer, not one can recover, with the sole exception of Henry Rabon. This is not only an exercise of "legislative authority" to change the law. It is discriminatory legislation which, if enacted by the General Assembly, would be open to serious question as to its constitutionality.

The relationship which Henry Rabon had to the hospital which he sues is not a new relationship previously unknown to the law. The hospital is not a type of creature previously unknown to the law. The events upon which he bases his alleged right to recover damages are not events previously unknown to the law. To be sure, much which was reasonable care in hospitals of 1863 would be gross carelessness in a hospital of 1963, to paraphrase the Oregon Court's opinion, but that is not the question before us. The question is whether we should now hold that the same relationship and precisely similar events which yesterday imposed no liability upon the hospital will, if repeated tomorrow, impose liability upon it tomorrow morning. To so determine is of the essence of the legislative process. It is not an exercise of the judicial power, which is the only governmental power that the people of this State have seen fit to

authorize us to exercise in their name. Of course, "the fact that a rule has been followed for fifty years is not a convincing reason why it must be followed for another fifty years if the reasons for the rule have ceased to exist," but it may well be a reason why this Court should follow it until the Legislature decides to change it.

Again, the majority opinion, quoting the Supreme Court of West Virginia, says, "*Stare decisis* is not a rule of law but is a matter of judicial policy." I do not so understand it. Of course, this Court has in the past overruled, and will in the future overrule, its former decisions in the proper exercise of the judicial function of government. However, a proper exercise of that power by a court is the result of its determination that its former decision was an erroneous statement of the law *when the decision was rendered* and, therefore, the law never has been as stated in the former opinion and the correction is retroactive. To change the existing law *for the future* because a different rule would be a wiser policy for the State of North Carolina to follow *in the future* is, in my opinion, a violation by this Court of the Constitution of North Carolina and a usurpation of a power which has not been granted to us by the people. That is, it is the violation, for a good purpose, of a rule of law by which we are bound rather than a mere casting aside of a judicial policy which we are at liberty to discard or retain at our pleasure.

There is much to be said in support of the view that a change in this rule stated in the former decisions of this Court should not be given retroactive effect. It may be that those decisions induced some hospitals not to carry liability insurance they otherwise would have procured. It may even be thought that those decisions have encouraged hospitals to be less concerned about negligence in the care of patients than they would otherwise have been. I doubt that those decisions have resulted in more injuries to patients than would otherwise have occurred. Nevertheless, there is a risk of injustice and hardship in a retroactive reversal of those decisions.

Assuming, as I do, that a change of the law, effective only as to the future, is desirable, the Legislature clearly has the authority to make it. This Court does not. Our authority is not enlarged by a possibility that the Legislature may see fit to leave the law where our predecessors declared it to be. The reluctance, if any, of the Legislature to exercise its power as we believe desirable does not shift that power to us.