Cheerleading and football at the University of North Carolina have come a long way since the days of Kay Kyser and "Choo Choo" Charlie Justice. Football and basketball at Carolina have graduated from varsity sports to big-time money-making industries.
Cheerleading is one of the necessary auxiliaries of these multi-million-dollar industries. And just as junior varsity sports is often a training ground for varsity sports, junior varsity cheerleading is often a training ground for varsity cheerleading.
A different analysis than that made by the majority is therefore appropriate.
Just as the Supreme Court of North Carolina took another look at the doctrine of charitable immunity in Rabon vs. Hospital,269 N.C. 1, 152 S.E.2d 485 (1967), finding that few hospital charities were true charities any longer, I believe it is time for our Courts to take another look at the status of big-time varsity sports and the persons who make the monetary success of those sports possible. In Rabon, one of the reasons the Supreme Court eliminated charitable immunity was that "charitable" hospitals had become money-making institutions supported by patient dollars and tax dollars. The money-making nature of big-time varsity sports leads me to the conclusion that these enterprises should pay for their human wreckage. I am well aware that the Industrial Commission is not the Supreme Court but I do not believe that I am the only one who draws a parallel between "charitable" hospitals and "varsity" sports.
In the case before the Industrial Commission the University undertook the sponsorship of a junior varsity cheerleading squad, including providing a faculty person as an advisor or overseer. The University did not have to provide an overseer. However, once it did so it was under a duty to choose a capable overseer. By having an overseer, members of the JV cheerleading squad were put under a false sense of security. Without an overseer, they would be responsible for their own safety. With an overseer, the overseer was the person so responsible.
Here, the overseer chosen by the University was not trained in cheerleading or the safety of cheerleading.
This tort claim arose out of an accident occurring on 15 January 1985, in Carmichael Auditorium, where plaintiff, a UNC cheerleader on the junior varsity (JV) team, was performing a pyramid stunt. The stunt was called a 2/1 chair which is a pyramid which has two base persons with one person standing on the shoulders of the two base persons on the ground, and then the top person of the pyramid is pitched up to the top and sits on the hand of an extended arm of one of the base persons who is on the second level. Jay Tobin and Warren Bane of the JV team formed the base of the pyramid.
Plaintiff was "popped" up by John Graham to sit on the hand of Pat Murphy who was standing on the shoulders of Jay and Warren. The pyramid became unstable, falling backwards. Pat pushed Plaintiff forward. John Graham, a designated spotter, caught plaintiff under her legs and the small of her back, but he did not catch her shoulders and plaintiff hit her head on the floor. Plaintiff sustained severe head injuries as a result of the fall.
The record evidence showed that the JV team used protective mats at their regular practices in Fetzer Gym but that they chose not to use these mats at the time of plaintiff's fall when they were practicing in Carmichael Auditorium. During the weeks prior to her January 15, 1985 fall, plaintiff had previously practiced being the top person on the 2/1 pyramid.
Although there was not a cheerleading coach assigned to work with the JV team at the time of the accident, there was an administrative advisor, Mary Sullivan, assigned to the cheerleaders. In addition, Robert Stallings, an experienced varsity cheerleader, was available to the JV squad and often assisted in their practices. Ms Sullivan had little training in cheerleading and no training in teaching cheerleading techniques or cheerleading coaching. She had no coaching experience, but she had advisor experience at the University of Louisville which had a qualified full time cheerleading coach.
Ms. Sullivan offered no help to the junior varsity teams in the way of guidance for cheers, dance or stunts. She gave no direction or advice to the team. She only helped with administrative functions. She did not attend junior varsity cheerleading practices and may have attended one game.
Sometimes Rob Stallings, the varsity team's representative to the junior varsity team, would offer encouragement, but he had no responsibility for teaching safety and cheering techniques. No university representative monitored practice, safety equipment use, weight training, the stunts they tried, or the progress the individuals or team made.
The cheerleader file produced by the University showed that as early as October 3, 1980, James Cansler, Associate Vice Chancellor for Student Affairs, discussed the dangers of cheerleading as performed at UNC with Mr. Boulton, the person in charge of the cheerleading team at UNC at the time in question.
He pointed out that the cheerleaders were representatives of the University, selected by a university sanctioned process, wore uniforms provided by the University, at that time were coached by a University paid coach and wore University uniforms. He argued that the University should not ". . . sponsor a dangerous activity and permit and encourage students to participate in it for the University's benefit only to disavow responsibility for injuries resulting from students' participation."
He suggested that a commission be appointed to evaluate whether cheerleader routines "are safe enough to permit their continued use."
In 1981, the Director, Department of Student Life sent a letter to Mr. Boulton stating that he had "growing anxiety about the safety of some of [the cheerleading] routines." An article from the National Collegiate Athletic Association dated March 31, 1981 that was in Dean Boulton's file said that the Southeastern Conference is recommending that pyramids higher than two levels be prohibited because of the dangers of pyramids higher than two levels. A letter to Dean Boulton shows that the cheerleaders wanted a qualified coach. Dean Boulton was notified that the Atlantic Coast Conference had banned higher than two level pyramids.
Dean Boulton's file showed that Wake Forest University permitted pyramids ". . . if the cheerleaders are skilled performers, if they are well coached, and if mats are required." Finally, on October 25, 1983 and in response to the ACC's removal of the ban, Dean Schroeder was asked to ". . . take charge of any future decisions with regard to the safety and well-being of our cheerleaders." With the exception of the last letter, all of this correspondence occurred before Robin attended Chapel Hill.
Dr. Rabinoff is an expert in gymnastics as it applies to cheerleading. He has worked with cheerleading squads in terms of gymnastics skills.
In Dr. Rabinoff's opinion, the University of North Carolina at Chapel Hill, on January 15, 1985 should have had a cheerleading coach, mats available for the pyramid from which Robin fell and she should have had two spotters who knew how to spot, and had a coach available. He testified that the defendant departed from the standard of care for universities similar in size, location and community as UNC and with the cheerleading development, training and experience that the J.V. team had by permitting this pyramid on January 15, 1985 because of the "lack of training of the participants, lack of coaching expertise on the part of the cheerleading coach, lack of safety assurances within the practices. . . . specifically to the use of mats."
He further testified that departure from the standard of care caused Robin's injury.
The defendant's negligence in ignoring warnings of danger for five years before plaintiff's injury and its violation the standard of care caused plaintiff's injury. The University should have warned the team about the danger and controversy surrounding these pyramids. Plaintiff relied on the University to provide guidance.
My vote is to affirm the decision of the Deputy Commissioner and award damages.
This 25th day of August, 1999.
S/_____________ THOMAS J. BOLCH COMMISSIONER