LARRY WAYNE SIDES, ADMINISTRATOR OF THE ESTATE OF TERRY COMPTON SIDES v. CABARRUS MEMORIAL HOSPITAL, INC.; J. VINCENT AREY; JOHN R. ASHE, JR.; CABARRUS CLINIC FOR WOMEN, P.A.; J. O. WILLIAMS; WILLIAM J. REEVES AND NANCY ELIZABETH DEASON

No. 73

(Filed 14 April 1975)

1. Hospitals § 1; Municipal Corporations § 1—establishment of county hospital — local act — county agency

In passing a local act providing for the establishment of Cabarrus Memorial Hospital, the General Assembly intended the hospital to be an agency of Cabarrus County and not a separate municipal agency of the State of North Carolina; therefore, the Industrial Commission did not have exclusive original jurisdiction of a claim based on alleged negligence of employees of the hospital.

2. Hospitals § 3; Municipal Corporations § 5—operation of hospital — proprietary function — liability for torts

The construction, maintenance and operation of a public hospital by a city or a county is a proprietary function, and such hospitals are therefore liable in tort for the negligent acts of their employees committed within the course and scope of their employment.

Justice EXUM did not participate in the hearing or decision of this case.

ON *certiorari* to review decision of the Court of Appeals reported in 22 N.C. App. 117, 205 S.E. 2d 784 (1974) (opinion by Campbell, J., Brock, C.J., and Britt, J., concurring) which affirmed the order entered by *Exum, J.,* on 19 February 1974, said order denying defendant's motion for dismissal.

This is an action instituted by plaintiff for personal injuries and for the wrongful death of plaintiff's intestate.

---

**Sides v. Hospital**

---

Plaintiff alleges that Terry Compton Sides was admitted to Cabarrus Memorial Hospital on 8 March 1971 in a pregnant condition. Later she gave birth to a daughter and subsequent to delivery of the baby began to lose blood. Plaintiff alleges that the hospital failed to match and cross-match Terry's blood when a transfusion was needed, and as a result, B-POSITIVE BLOOD was negligently transfused into her body when her blood type was A-NEGATIVE. Plaintiff further alleges that the doctors allowed the wrong blood type to be transfused into deceased's body and that this negligence can be imputed to the hospital. As a result of these alleged acts, plaintiff contends that deceased suffered a "transfusion reaction resulting in death."

Defendant, Cabarrus Memorial Hosiptal, filed a motion to dismiss under the provisions of G.S. 1A-1, Rule 12(b) (1), (2) and (6), on the grounds that the court did not have jurisdiction over the subject matter; that the court did not have jurisdiction over the defendant; and that the plaintiff had failed to state a claim upon which relief could be granted. In support of this motion, the defendant attempted to show the following:

"1. That the Cabarrus Memorial Hospital is a political subdivision of Cabarrus County and the State of North Carolina, having been created under the provisions of Chapter 307 of the Public-Local Laws adopted by the 1935 General Assembly of North Carolina.

"2. That the operation of the Cabarrus Memorial Hospital described in the Claim for Relief is a governmental function, and said Cabarrus Memorial Hospital, being an agency of the State of North Carolina, is immune from suit in actions of the kind and character instituted herein by the plaintiff.

"3. That the General Court of Justice, Superior Court Division, is without jurisdiction to hear and determine the plaintiff's action, for that the North Carolina Industrial Commission has been constituted a court by the General Assembly of North Carolina for the purpose of hearing and passing upon tort claims against all departments, institutions and agencies of the State."

Defendant's motion was treated as a motion for summary judgment and was heard before Judge Exum at the 3 September 1973 Civil Session of Cabarrus County Superior Court. On 19 February 1974 Judge Exum denied this motion.

Defendant appealed to the Court of Appeals under the provisions of G.S. 1-277 (b). After considering all of defendant's contentions, the Court of Appeals held:

> "The defendant Cabarrus Memorial Hospital is a county agency and is bound by the county's purchase of insurance for the defendant. Defendant's argument that it may accept the benefit of county bonds, county taxes, use of the county treasury and treasurer and exemption from taxation as a county agency but that it may disavow the county's purchase of insurance is without merit. Each instance merely involves a cost of doing business. We find no error in the denial by the trial court of defendant's motion to dismiss and the denial of its motion for summary judgment." 22 N.C. App. at 122-23, 205 S.E. 2d at 788.

Writ of certiorari to the North Carolina Court of Appeals was allowed on 30 August 1974. The case was docketed and argued as No. 70 at the 1974 Fall Term of this Court.

*Hartsell, Hartsell & Mills, P.A., by William L. Mills, Jr., and Fletcher L. Hartsell, Jr., for defendant appellant.*

*Byrd, Byrd, Ervin & Blanton, by John W. Ervin, Jr. for plaintifff appellee.*

COPELAND, Justice.

[1] Was Cabarrus Memorial Hospital a political subdivision of Cabarrus County *or* of the State of North Carolina?

Defendant contends it is a separate governmental agency of the State of North Carolina and that exclusive original jurisdiction over the claim is vested solely in the North Carolina Industrial Commission under provisions of the North Carolina Tort Claims Act. G.S. 143-291, et seq.

In deciding this issue it is necessary to closely examine Chapter 307, 1935 Public-Local and Private Laws. This Act, in pertinent part, provides:

> "Section 1. That the Board of County Commissioners of Cabarrus County, North Carolina, by a majority vote of said Board, or upon the petition of two hundred voters of said county, shall . . . order an election to be held to determine the will of the people of said county whether there shall be issued and sold bonds . . . and to levy a tax of not exceeding two cents on the one hundred dollar valuation of

property, the proceeds of sale of said bonds to be issued to be used in securing lands and erecting or altering buildings and equipping same to be used as a public hospital for said county. . . . The said Board of County Commissioners shall also levy a tax not to exceed two cents on the one hundred dollar valuation of property for the maintenance and up-keep of said hospital. . . . The hospital so erected from the sale of said bonds in addition to other hospitalization funds from other sources shall be known as the 'Cabarrus County Hospital.'

                    *    *    *    *

"Sec. 3. If a majority of the qualified voters shall vote 'For Cabarrus County Hospital,' at any election held under this Act, then the County Commissioners shall issue and sell bonds . . . and shall pay over the proceeds arising therefrom to the Treasurer of Cabarrus County . . . and the taxes which may be levied and collected under this Act shall also be paid to the Treasurer of Cabarrus County, and by said Treasurer kept in two separate accounts, one of said accounts being the hospital interest and sinking fund, and the other account the hospital maintenance fund . . . and it shall be the duty of the Board of Commissioners of Cabarrus County to annually levy and collect as other taxes a special tax not exceeding the limit provided by this Act, sufficient to pay the interest on said bonds, and to provide the necessary sinking fund for the payment of same, and also to afford the necessary maintenance fund as herein provided.

                    *    *    *    *

"Sec. 5. Should a majority of the qualified voters of Cabarrus County, under any election held under this Act, vote 'For Cabarrus County Hospital,' then the County Commissioners shall at once appoint a Board of Trustees, one trustee to come from each and every voting precinct in the county. . . . Upon the first meeting of the Board of Trust-ees . . . the said Board shall appoint an executive committee composed of seven members from the trustees, all residents of the county. . . .

"Sec. 6. . . . The county treasurer of the county in which such hospital is located shall be Treasurer of the executive committee. . . . [A]ll moneys received for such hospital shall be deposited in the treasury of the county

to the credit of the hospital fund. . . . Said executive committee . . . shall in general carry out the spirit and intent of this Act in establishing and maintaining a county public hospital. . . . [A]nd the committee shall during the first week in January of each year file with the Board of Commissioners of said county a report . . . and a statement of all receipts and expenditures during the year, and shall at such time certify to the Board of County Commissioners the amount necessary to maintain and improve such hospital for the ensuing year. . . .

"Sec. 7. The hospital established under this Act shall be for the benefit of the inhabitants of Cabarrus County, and of any person falling sick or being injured or maimed within its limits; . . .

*     *     *     *

"Sec. 9. That 'Cabarrus County Hospital' is hereby declared to be a body corporate, with power to receive and hold gifts, grants, and devises of real and personal property, to sue and be sued, and to do any and all lawful acts necessary to carry out the objects of its creation, and shall possess all other rights and powers usually incident to corporations."

We believe this Act makes it clear that the General Assembly never intended Cabarrus Memorial Hospital to be a separate and independent agency of the State of North Carolina. In addition to granting the county the authority to levy a special tax to provide for the operation and maintenance of the hospital and to substantially control its operations through the county board of commissioners, Section 6 of the Act provides specifically that the hospital's executive committee *"shall in general carry out the spirit and intent of this Act in establishing a county public hospital."* (Emphasis supplied.)

Also we note that the formal or informal interpretation of a statute or law by an administrative agency of the executive department is entitled to consideration from the courts, and must be accorded appropriate weight in determining the meaning of the law. *See, e.g.,* 2 Am. Jur. 2d Administrative Law § 241 (1962) ; 7 Strong, N. C. Index 2d, Statutes § 5 (1968). *Accord, Faizan v. Insurance Co.,* 254 N.C. 47, 57, 118 S.E. 2d 303, 310 (1961).

In this context, the following opinions or rulings by various State and Federal agencies have held Cabarrus Memorial Hospital to be an agency or instrumentality of the county.

(1) In a letter dated 31 March 1966, former Attorney General T. W. Bruton stated:

"I have studied Chapter 307 of the Public-Local Laws of 1935 creating Cabarrus Memorial Hospital. *In my opinion, it is a county agency. . . .*" (Emphasis supplied.)

(2) In a letter dated 22 July 1971, former Attorney General Robert Morgan stated:

"In your letter of June 25, 1971, and a telephone conversation subsequent thereto, you have asked to be advised as to the legal status of the Cabarrus Memorial Hospital. In this regard, *it is my opinion that the Cabarrus Memorial Hospital is a wholly-owned instrumentality of the County* and is a separate independent, juristic, political subdivision of government with regard to social security and retirement purposes. . . ." (Emphasis supplied.)

(3) In a "determination letter" dated 23 November 1964, the United States Internal Revenue Service ruled:

"*[I]t is the opinion of this office that you are an instrumentality of the County of Cabarrus,* a political subdivision of the State of North Carolina, and as such you are not subject to Federal income tax." (Emphasis supplied.)

(4) In a letter dated 14 April 1971, former North Carolina Commissioner of Revenue, I. L. Clayton, ruled that Cabarrus Memorial Hospital was a *"county-owned and operated hospital"* and an *"integral part of the county operation and body politic of the county."* (Emphasis supplied.)

(5) In a letter dated 20 December 1971, the North Carolina Employment Security Commission ruled:

"This Agency concurred in the ruling of the Attorney General *that Cabarrus Memorial Hospital is an instrumentality of a political subdivision, Cabarrus County* and, therefore, exempt under the Employment Security Law." (Emphasis supplied.)

We note that at the time defendant's charter was adopted by the General Assembly, there was existing a "general law"

that enabled counties to establish and maintain public hospitals. *See* Chapter 42, 1913 Public Laws, ratified 3 March 1913, and codified as G.S. 131-4, et seq. This act was last amended by Chapter 247, 1929 Public Laws, and therefore was codified as presently written on 17 April 1935, the date defendant's charter was adopted by the General Assembly. There is a substantial similarity between G.S. 131-4, et seq., the general law, and Chapter 307, the special-local law. However, the laws differ in two important areas. (1) Under the "general law" the county commissioners are authorized to impose a tax of one-fifteenth of one cent (1/15 of 1¢) on the dollar ($1.00) of assessed property in such county. This is equivalent to a tax of 6.6¢ per $100.00 of assessed property. However, under the "special law," the county commissioners are authorized: (a) To levy a tax not exceeding two cents on the one hundred dollar valuation of property to secure the land, to erect the buildings, and to pay the interest on the bonds; and (b) to also levy a tax not to exceed two cents on the one hundred dollar valuation of property to pay for the upkeep and maintenance of the hospital. This is equivalent to a total tax of 4¢ per $100.00 of assessed property. (2) Under the "general law" the hospital board of trustees, after initial appointment, are to be elected at the next general election. However, under the "special law" there is no provision for the popular election of the hospital's board of trustees.

Based on examination of the public and local acts above cited, including relevant administrative rulings, we hold that Cabarrus Memorial Hospital is an agency of Cabarrus County and not a separate municipal agency of the State of North Carolina. It is clear that this was the intent of the General Assembly. In fact, the only justification we can discern for defendant's creation under the special act was to take advantage of the lower tax rate (4¢ per $100 valuation as opposed to 6.6¢ per $100 valuation) and to have the county commissioners appoint the hospital board of trustees rather than have them elected.

[2] Having determined that defendant hospital is an agency of the county, we must next decide if the county's construction, maintenance and operation of the hospital was a governmental or a proprietary function.

In the case *sub judice,* with respect to the proprietary-governmental distinction, we can find no ruling by this Court as to whether the constuction, maintenance and operation of a hospital by a county or a city is a governmental function or a pro-

prietary one. This question is, therefore, one of first impression. *But see Hitchings v. Albemarle Hospital,* 220 F. 2d 716 (4th Cir. 1955) (N.C. law).

.At this point, we note that this Court has held that the expenditure of tax funds for the construction of a general county hospital is for a *public purpose. Rex Hospital v. Comrs. of Wake,* 239 N.C. 312, 79 S.E. 2d 892 (1954). In that case, Justice Denny (later Chief Justice), writing for the Court, stated: "The expenditure of tax funds for the construction of a general county hospital is for a public purpose; and a county, when authorized by the General Assembly and with the approval of a majority of the voters voting in an election held as provided by law, has as much right to issue its bonds to provide hospital facilities for those citizens who are able to pay for the services rendered to them as it does to provide such facilities for the sick and afflicted poor. [Citations omitted.]" *Id.* at 329, 79 S.E. 2d at 904. *Cf. Foster v. Medical Care Comm.,* 283 N.C. 110, 195 S.E. 2d 517 (1973) (financing plan for private non-profit and public hospitals declared unconstitutional under the public purpose doctrine). This Court has also held that although such expenditures are for a valid *public purpose,* they are not a *necessary expense. See, e.g., Palmer v. Haywood County,* 212 N.C. 284, 193 S.E. 668 (1937); *Armstrong v. Comrs.,* 185 N.C. 405, 117 S.E. 388 (1923). However, as noted *infra,* these decisions are not controlling on the question of governmental vs. proprietary function. *Compare Turner v. Reidsville,* 224 N.C. 42, 29 S.E. 2d 211 (1944), *with Rhodes v. Asheville,* 230 N.C. 134, 52 S.E. 2d 371 (1949).

The problem we presently face was well stated by Justice Barnhill (later Chief Justice) in *Millar v. Wilson,* 222 N.C. 340, 23 S.E. 2d 42 (1942): "The line between municipal operations that are proprietary and, therefore, a proper subject of suits in tort and those that are governmental and, therefore, immune from suits is sometimes difficult to draw." *Id.* at 342, 23 S.E. 2d at 44.

This problem is made more difficult by two further considerations. First, although an activity may be classified in general as a governmental function, liability in tort may exist as to certain of its phases; and conversely, although classified in general as proprietary, certain phases may be considered exempt from liability. *Compare Woodie v. North Wilkesboro,* 159 N.C. 353, 74 S.E. 924 (1912) (operation of municipal water plant

held proprietary) *with Klassette v. Drug Co.*, 227 N.C. 353, 42 S.E. 2d 411 (1947) (furnishing of water to extinguish fires held governmental). Second, it does not follow that a particular activity will be denoted a governmental function even though previous cases have held the identical activity to be of such a *public necessity* that the expenditure of funds in connection with it was for a *public purpose. Compare Turner v. Reidsville,* 224 N.C. 42, 29 S.E. 2d 211 (1944) (held expenditure of public funds for construction and maintenance of airport was for a *public purpose) with Rhodes v. Asheville,* 230 N.C. 134, 52 S.E. 2d 371 (1949) (held operation and maintenance of airport a proprietary and *not a governmental function); James v. Charlotte,* 183 N.C. 630, 112 S.E. 423 (1922) (held city engaged in governmental function when it removed garbage *for its inhabitants* for a fee that covered only its actual collection and disposal expenses) *with Koontz v. City of Winston-Salem,* 280 N.C. 513, 186 S.E. 2d 897 (1972) (held city engaged in proprietary functions in operating a landfill for disposal of garbage where city had contracted with county to dispose of county garbage for a fee); *Glenn v. Raleigh,* 246 N.C. 469, 98 S.E. 2d 913 (1957) (held city acting in proprietary capacity when charged small fee for admission to public park) *with Rich v. City of Goldsboro,* 282 N.C. 383, 192 S.E. 2d 824 (1972) (operation of playground on which city received donations of less than 1% of operating cost held governmental function). *See generally* R. Ligon, North Carolina Hospital Law 153-64 (Inst. of Gov't. 1964).

As Justice Branch stated in *Koontz v. City of Winston-Salem, supra,* "application of [the governmental-proprietary distinction] to given factual situations has resulted in irreconcilable splits of authority and confusion as to what functions are governmental and what functions are proprietary." 280 N.C. at 528, 186 S.E. 2d at 907. Nonetheless, an analysis of the various activities that this Court has held to be proprietary in nature reveals that they involved *a monetary charge* of some type. *See, e.g., Koontz v. City of Winston-Salem, supra* (charge for use of garbage landfill); *Glenn v. Raleigh, supra* (charge for admission to public park); *Foust v. Durham,* 239 N.C. 306, 79 S.E. 2d 519 (1954) (supplying water to customers for which a charge was made and from which a profit was realized); *Rice v. Lumberton,* 235 N.C. 227, 69 S.E. 2d 543 (1952) (distributing electricity for profit); *Rhodes v. Asheville, supra* (operation of airport); *Lowe v. Gastonia,* 211 N.C. 564, 191

S.E. 7 (1937) (operation of golf course). *Cf., Rich v. City of Goldsboro, supra* (operation of playground for which city received donations of less than 1% of the operating cost held governmental and not proprietary); *Parks-Belk Co. v. Concord,* 194 N.C. 134, 138 S.E. 599 (1927) (held no liability for bursting water main used both for furnishing water for fire protection and for sanitary purposes, and for distributing water to consumers paying a rate).

While a "charge" has been involved in each case holding a particular function to be proprietary, we note that the basis for each holding was not dependent on the "profit motive." For example, in *Glenn v. Raleigh, supra,* the total annual receipts from the operation of Chavis and Pullen Parks amounted to $22,648.99, while the over-all annual cost to operate and to maintain *all* of the city's parks, including its recreational program, was $158,247.95. 246 N.C. at 480, 98 S.E. 2d at 921. That the "profit motive" is not essential to a proprietary classification is further documented by the decision of this Court in *Rhodes v. Asheville, supra.* In that case, this Court, in an opinion by Justice Denny (later Chief Justice), stated: "Airports are here to stay and will be used extensively by the public in the future. *However, transportation by air has not been developed to a point so as to make the construction, operation and maintenance of the average airport a profitable enterprise.* That is why private capital is not available for this purpose." 230 N.C. at 141, 52 S.E. 2d at 376. (Emphasis supplied.) Nevertheless, despite the lack of profit, the Court held the construction, operation and maintenance of the airport by the county to be a proprietary or corporate function.

Furthermore, it appears that all of the activities held to be governmental functions by this Court are those historically performed by the government, and which are not ordinarily engaged in by private corporations. *See, e.g., Hayes v. Billings,* 240 N.C. 78, 81 S.E. 2d 150 (1954) (erecting and maintaining a jail by a county); *Hamilton v. Hamlet,* 238 N.C. 741, 78 S.E. 2d 770 (1953) (installation and maintenance of traffic light signals); *Lewis v. Hunter,* 212 N.C. 504, 193 S.E. 814 (1937) (operation of police car); *Cathey v. Charlotte,* 197 N.C. 309, 148 S.E. 426 (1929) (erection and maintenance of police and fire alarm system); *Howland v. Asheville,* 174 N.C. 749, 94 S.E. 524 (1917) (furnishing water for extinguishing fires).

·In the case *sub judice* there is no doubt that the hospital derived some pecuniary benefits from its day to day operations. In fact, it is common knowledge that hospitals derive "substantial revenues" from daily room rents, nursing care, laboratory work, etc. This is a crucial factor under our decisions. "Our city and county hospitals make charges for some of their services based on market value rather than actual expense, so that net revenues are obtained even though in particular instances *the activity of the hospital as a whole may be nonprofitable.*" R. Ligon, North Carolina Hospital Law, *supra*, at 160 (Emphasis supplied.) ·However, the fact that the operation as a whole is nonprofitable ·is not determinative as to whether the activity will be classified as proprietary or governmental.

Although the doctrine of immunity as applied to governmental hospitals is being increasingly abandoned by state courts, it still appears to be the rule in the majority of states. For a state-by-state analysis, *see* IIA Hospital Law Manual. Negligence, Immunity to Suit, Section 3, 45-55; Annot., "Immunity from Liability for Damages in Tort of State or Governmental Unit or Agency in Operating Hospital," 25 A.L.R. 2d 203 (1952) and supplemental decisions. Suffice it to say, there is precedent from other jurisdictions to support both views, i.e., that the operation of a hospital is a governmental function, and that it is a proprietary function. However, we fail to discern any "uniform standard" for determining whether a hospital is operated in the performance of a governmental or a proprietary function in any of these cases. *See* Annot., *supra*, at 207. And yet, the trend is obvious. This doctrine, like the doctrine of charitable immunity, is being increasingly abandoned by state courts. *See* IIA, Hospital Law Manual, *supra*; Annot., *supra*, particularly supplemental decisions thereto. In this context, one commentator has recently stated: "The doctrine of governmental immunity, especially when applied to the hospital, is as unsatisfactory and anachronistic as the doctrine of charitable immunity." Doctor and Hospital Liability Today 233 (1972 Practicing Law Institute). · ·

In *Rabon v. Hospital*, 269 N.C. 1, 152 S.E. 2d 485 (1967), this Court, in an opinion by Justice Sharp (now Chief Justice), abolished the doctrine of charitable immunity as it applied to hospitals in North Carolina. Specifically the Court stated:

"Convinced that the rule of charitable immunity can no longer properly be applied to hospitals, we hereby over-

---

Sides v. Hospital

---

rule *Williams v. Hospital,* 237 N.C. 387, 75 S.E. 2d 303, *Williams v. Hospital Asso.,* 234 N.C. 536, 67 S.E. 2d 662, and other cases of similar import. We hold that defendant Hospital is liable for the negligence of its employees acting within the scope and course of their employment just as is any other corporate employer. Recognizing, however, that hospitals have relied upon the old rule of immunity and that they may not have adequately protected themselves with liability insurance, we follow the procedure of Michigan, Illinois, Nebraska, and Wisconsin, as detailed in the decisions previously noted. The rule of liability herein announced applies only to this case and to those causes of action arising after January 20, 1967, the filing date of this opinion." *Id.* at 21, 152 S.E. 2d at 499.

In Rabon, *supra,* Justice Lake dissented, in part, on the grounds that it was *not* a case of first impression. *Id.* at 25, 152 S.E. 2d at 499. In the case *sub judice,* this Court is faced with a question of first impression, to wit: Is the construction, maintenance and operation of a hospital by a county or a city a governmental or a proprietary function? In resolving this issue, we once again "stand at a crossroads created by the courts' applications of the various rules of governmental immunity." *Koontz v. City of Winston-Salem,* 280 N.C. at 529, 186 S.E. 2d at 908. Here, however, we believe the following language clearly indicates the direction we should now take:

"[W]e recognize merit in the modern tendency to restrict rather than to extend the application of governmental immunity. This trend is based, *inter alia,* on the large expansion of municipal activities, the availability of liability insurance, and the plain injustice of denying relief to an individual injured by the wrongdoing of a municipality. A corollary to the tendency of modern authorities to restrict rather than to extend the application of governmental immunity is the rule that in cases of doubtful liability application of the rule should be resolved against the municipality. [Citations omitted.]" *Id.* at 529-30, 186 S.E. 2d at 908.

It seems clear to us that the operation of a public hospital is not one of the "traditional" services rendered by local governmental units. Accordingly, for this reason, and for the reasons hereinbefore stated, we hold that the construction, maintenance and operation of a public hospital by either a city or a county is

a proprietary function. Hence, such hospitals, just like any other corporate employer, are liable in tort for the negligent acts of their employees committed within the course and scope of their employment.

Since we hold that the operation of Cabarrus Memorial Hospital is a proprietary function, there is no need to discuss defendant's other arguments relating to the applicability of G.S. 153-9 (44) [now G.S. 153A-435], pertaining to waiver of governmental immunity by the county board of commissioners to the extent of secured liability insurance, or for any other reason.

Finally, with reference to this case, we point out that it is now only in the pleading stage. Whether plaintiff can ultimately recover, remains to be seen.

The judgment of the Court of Appeals is

Modified and affirmed.

Justice EXUM did not participate in the hearing or decision of this case.