S. Envtl. Law Ctr. v. Saylor, 2019 NCBC 59.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 500268

SOUTHERN ENVIRONMENTAL
LAW CENTER,

Plaintiff,

v.

SCOTT M. SAYLOR, in his official
capacity as President of the North
Carolina Railroad Company,

The NORTH CAROLINA RAILROAD
COMPANY,

and

MICHAEL WALTERS, JACOB F.
ALEXANDER III, WILLIAM V.
BELL, MARTIN BRACKETT, LIZ
CRABILL, WILLIAM H.
KINCHELOE, JAMES E. NANCE,
JOHN M. PIKE, GEORGE
ROUNTREE III, FRANKLIN
ROUSE, DOUGLAS STAFFORD,
NINA SZLOSBERG-LANDIS, and
MICHAEL L. WEISEL, in their
official capacities as members of the
Board of Directors of the North
Carolina Railroad Company,

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

1. **THIS MATTER** is before the Court on the Motion for Judgment on the Pleadings filed on August 2, 2019 by Defendants Scott M. Saylor ("Saylor"), in his official capacity as President of the North Carolina Railroad Company ("NCRR"); the NCRR; and Michael Walters ("Walters"), Jacob F. Alexander III, William V. Bell,

Martin Brackett, Liz Crabill, William H. Kincheloe, James E. Nance, John M. Pike, George Rountree III, Franklin Rouse, Douglas Stafford, Nina Szlosberg-Landis, and Michael L. Weisel, all in their official capacities as members of the Board of Directors of the NCRR (collectively, "Defendants"). (ECF No. 7.) After full briefing on the Motion and a hearing held on September 10, 2019, for the reasons stated herein, the Court **DENIES** the Motion.

> *Southern Environmental Law Center, by Kimberley Hunter and Ramona McGee, for Plaintiff.*

> *Womble Bond Dickinson (US) LLP, by James P. Cooney, Russ Ferguson, and Rebecca C. Fleishman, for Defendants.*

Robinson, Judge.

## I.    INTRODUCTION

2.    This case raises an intriguing question: may "private" corporations, otherwise generally exempt from the disclosure requirements of the North Carolina Public Records Act, N.C.G.S. §§ 132-1–132-10 ("Public Records Act" or the "Act"), nonetheless be subject to the Act's requirements where those corporations are wholly-owned by the State of North Carolina?

3.    By initiating this lawsuit, Plaintiff Southern Environmental Law Center ("SELC") ultimately seeks an order from this Court pursuant to the Public Records Act and N.C.G.S. § 1-253 compelling the NCRR and its agents to permit inspection of certain documents pursuant to the Act. To get there, however, SELC must establish (1) that the NCRR is an "agency" of the State for purposes of the Act, and (2) that the documents requested by SELC are public documents subject to disclosure under the

Act. The instant Motion targets that first question—whether the NCRR is an "agency" as defined by our public records statutes. Generally, Defendants' position is that the NCRR is a private corporation that is not subject to the Public Records Act, regardless of the fact that all of the stock of the corporation is owned by the State of North Carolina. Defendants contend that ownership of 100% of the stock of the NCRR, and conduct by the State consistent with being the sole shareholder of a private corporation, does not, in and of itself, make the NCRR subject to the Public Records Act. Defendants further contend that considerable authority from the North Carolina Executive Branch (via the Attorney General), the staff of the Legislative Branch, and case law from both the North Carolina Supreme Court and Court of Appeals and at least one federal court in North Carolina, establishes as a matter of law that the NCRR is not an "agency" subject to the Act. Accordingly, the Motion seeks judgment on the pleadings in Defendants' favor and dismissal of SELC's Complaint for failure to state a claim upon which relief may be granted.

4. SELC disputes this position and argues that the State of North Carolina exercises significant supervisory responsibilities and control over the NCRR, and, accordingly, should be considered an agency of the North Carolina government for purposes of the Public Records Act. Pursuant to N.C.G.S. § 132-9(a), this matter is given priority and decided in an expedited manner.

## II.   FACTS AND PROCEDURAL HISTORY

5.   The Court does not make findings of fact on a motion for judgment on the pleadings but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motion.

6.   SELC is a § 501(c)(3) not-for-profit organization chartered as a North Carolina non-profit corporation with its principal place of business in Charlottesville, Albemarle County, Virginia.  (Compl. ¶ 1, ECF No. 3 ["Compl."]; Answer ¶ 1, ECF No. 5 ["Answer"].)  SELC maintains registered offices in North Carolina.  (Compl. ¶ 1; Answer ¶ 1.)  SELC, which works to protect the environment in a host of ways, was significantly involved in advocating for the Durham-Orange Light Rail transit project (the "Light Rail Project").  (Compl. ¶ 2.)  The Light Rail Project was a planned 17.7 mile light rail line linking Durham and Chapel Hill, North Carolina.  (Compl. ¶ 2, fn. 1.)

7.   The NCRR is a North Carolina corporation with its principal place of business in Raleigh, Wake County, North Carolina.  (Compl. ¶ 4; Answer ¶ 4.)  Saylor is the President of the NCRR and the custodian of its public records.  (Compl. ¶ 3; Answer ¶ 3.)  Walters is the Chairman of the NCRR Board of Directors and is also a custodian of its public records.  (Compl. ¶ 5; Answer ¶ 5.)  The remaining individual defendants are all members of the NCRR Board of Directors and are also custodians of its records.  (Compl. ¶¶ 6–17; Answer ¶¶ 6–17.)  All individual defendants are sued in their official capacities.  (Compl. ¶¶ 3, 5–17; Answer ¶¶ 3, 5–17.)

8. SELC alleges that the NCRR owns some of the existing tracks that the Light Rail Project contemplated the Durham-Orange light rail line would travel alongside through downtown Durham and that the NCRR refused to sign a cooperative agreement with other Light Rail Project partners. (Compl. ¶ 2, fn. 1.) Through this lawsuit, SELC seeks certain records from the NCRR related to the Light Rail Project. (Compl. ¶ 51.)

9. The NCRR was incorporated by an Act of the North Carolina General Assembly (the "General Assembly") in 1849. (Compl. ¶ 36; Answer ¶ 36; Ex. 4 to Answer ["NCRR Charter"].) The Act established the charter for the NCRR (the "NCRR Charter"). (Compl. ¶ 36; Answer ¶ 36.) The NCRR Charter provides that the NCRR shall "have a corporate existence as a body politic in perpetuity." 1848–49 N.C. Laws, CH LXXXII, Sec. 1 (Jan. 27, 1849). (NCRR Charter 2.)

10. The stated mission of the NCRR is "[p]utting the North Carolina Railroad Company to work for the good of the people of North Carolina." (Compl. ¶ 31.) NCRR's mission statement proclaims that "[t]he railroad corridor is a rich asset, which [the NCRR] proudly protect[s] and manage[s] for the benefit of North Carolina's citizens." (Compl. ¶ 32.)

11. When the NCRR was originally established, the State of North Carolina paid an initial $2 million to become its majority shareholder. (Compl. ¶ 37.) The NCRR Charter also permitted commissioners to raise another $1 million from other investors by way of stock subscriptions. 1848–49 N.C. Laws, CH LXXXII, Sec. 5. As

a mathematical result, upon full subscription, the State originally owned two-thirds of the entity and other investors owned the remaining one-third.

12. In 1998, the State bought out the remaining privately-held NCRR shares and became the NCRR's sole shareholder. (Compl. ¶ 38.) Since becoming the sole shareholder, the State has paid for $71.5 million in capital improvements for tracks, signals, and bridges on NCRR's railroad corridor. (Compl. ¶ 41.)

13. All thirteen members of the NCRR Board of Directors are appointed either by the Governor of North Carolina (7 appointments) or the General Assembly (3 appointments by the Speaker of the House and 3 appointments by the President *pro tempore* of the Senate). *See* N.C.G.S. § 124-15. (Compl. ¶ 35; Answer ¶ 35.) North Carolina law requires the NCRR to provide annual reports to the General Assembly. N.C.G.S. § 124-17(a). (Compl. ¶ 43.) Section 124-17 also provides that "[u]pon the request of the Governor or any committee of the General Assembly, [the NCRR] shall provide all additional information and data within its possession or ascertainable from its records." N.C.G.S. § 124-17(b). This subsection of Section 124-17 also states that such disclosure "shall not be deemed to have waived any attorney-client privilege[.]" *Id.* Further, under subsection (c), confidential information provided to the Governor or General Assembly pursuant to a request made of the NCRR "is exempt from [the Public Records Act]" and shall not be subject to a request [for inspection of public records]." *Id.* § 124-17(c).

14. Legislation passed in 2011 requiring an evaluation of the NCRR describes the corporation as "a discretely reported component unit of the State." N.C. Sess.

Law, 2011-145, Sec. 28.12A, as amended. (Compl. ¶ 44.) The General Assembly's Program Evaluation Division thereafter published Report Number 2012-10 on the NCRR for the Joint Legislative Program Evaluation Oversight Committee (the "Evaluation Report"). (Compl. ¶ 47; Answer ¶ 47; Ex. 2 to Answer ["Evaluation Div. Report"].) The Evaluation Report stated that the "NCRR has benefitted from its unique relationship with the State of North Carolina, the corporation's sole shareholder." (Evaluation Div. Report 1; *see* Compl. ¶ 47 (partially quoted language); Answer ¶ 47.) This Evaluation Report also states that "[b]ecause NCRR is not part of state government, several state laws do not apply to the corporation[, including] . . . the State's public records law." (Evaluation Report 9.)

15. The NCRR also has eminent domain powers, above and beyond those of private railroads. (Compl. ¶ 49.) Further, because of its relationship with the State, the NCRR is exempt from Federal and State income taxes. (Compl. ¶ 50.)

16. On May 23, 2019, SELC submitted a request to Saylor in which it sought to inspect all records in the NCRR's possession or control related to the Light Rail Project generated since January 1, 2018. (Compl. ¶ 51; Ex. A to Compl.) On June 25, 2019, the NCRR's counsel replied in a letter to SELC that "because NCRR is not subject to the [Public Records] Act, it will not be producing materials in response to [the SELC's] request[.]" (Compl. ¶ 52; Ex. B to Compl.)

17. As a result of these communications, SELC filed the instant lawsuit on July 1, 2019. (ECF No. 3.) Thereafter, on August 2, 2019, Defendants filed their Answer, (ECF No. 5), and simultaneously filed a Notice of Designation to the North Carolina

Business Court, (ECF No. 6). Additionally, on August 2, 2019, one minute before filing their Answer, Defendants filed the Motion, (ECF No. 7), with a supporting brief, (ECF No. 8).

18. Following designation of this case as a mandatory complex business case on August 5, 2019 by Order of the Chief Justice of the North Carolina Supreme Court, (ECF No. 1), and assignment to the undersigned on the same day by the Chief Business Court Judge, (ECF No. 2), the Court noticed and conducted a scheduling conference with counsel for the parties, (*see* ECF No. 11). As a result of that conference, the Court issued a briefing order, (ECF No. 12), setting deadlines for response and reply briefs on the Motion and a date for oral argument. On August 21, 2019, the Court noticed the Motion for hearing for September 10, 2019. (ECF No. 14.) SELC timely filed its response brief in opposition to the Motion on August 21, 2019, (ECF No. 15), and Defendants timely filed their reply brief on August 30, 2019, (ECF No. 21). The Court conducted the hearing on the Motion on September 10, 2019 at which counsel for all parties were present. The Motion is therefore ripe for determination.

### III. LEGAL STANDARD

19. "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Carpenter v. Carpenter*, 189 N.C. App. 755, 761, 659 S.E.2d 762, 767 (2008). On a Rule 12(c) motion, "[t]he movant is held to a strict standard and must show that no material issue of facts exists and that

he is clearly entitled to judgment." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). "[T]he court cannot select some of the alleged facts as a basis for granting the motion on the pleadings if other allegations, together with the selected facts, establish material issues of fact." *J. F. Wilkerson Contracting Co. v. Rowland*, 29 N.C. App. 722, 725, 225 S.E.2d 840, 842 (1976). The Court must read the pleadings in the light most favorable to the nonmoving party, and

> [a]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (citations omitted).

20. "Judgment on the pleadings is not favored by the law . . . ." *Huss v. Huss*, 31 N.C. App. 463, 466, 230 S.E.2d 159, 162 (1976). The function of Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "[J]udgment on the pleadings is not appropriate merely because the claimant's case is weak and he is unlikely to prevail on the merits." *Huss*, 31 N.C. App. at 469, 230 S.E.2d at 163. "A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in substance as to present no material issue of fact . . . ." *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990).

21. If documents are attached to and incorporated within a complaint, they become part of the complaint. *Eastway Wrecker Servs., Inc. v. City of Charlotte*, 165

N.C. App. 639, 642, 599 S.E.2d 410, 412 (2004) ("Since the exhibits to the complaint were expressly incorporated by reference in the complaint, they were properly considered in connection with the motion to dismiss as part of the pleadings."). Accordingly, any such documents may be considered in connection with a motion for judgment on the pleadings without converting it into a motion for summary judgment. *Id.*; *see also Reese v. City of Charlotte*, 196 N.C. App. 557, 561, 676 S.E.2d 493, 496 (2009). The Court may also consider documents that are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant. *See Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001). Where the plaintiff has made no admissions about a document, however, it may not be considered by the trial court on a Rule 12(c) motion, even if it is attached to an answer. *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 205, 652 S.E.2d 701, 708 (2007) ("[T]his Court has specifically held that a document attached to the moving party's pleading may not be considered in connection with a Rule 12(c) motion unless the non-moving party has made admissions regarding the document.").[1]

---

[1] In light of this standard, the Court acknowledges herein that although Defendants attach numerous documents to their answer to which SELC has made no admission, the Court does not consider those documents in deciding the Motion. Accordingly, this Motion is decided pursuant to the standard for determination of Rule 12(c) motions and not pursuant to Rule 56. *See Estate of Belk v. Boise Cascade Wood Prods., L.L.C.*, 824 S.E.2d 180, 183 (N.C. Ct. App. 2019) ("[T]he trial court is not required to convert a motion to dismiss into one for summary judgment simply because additional documents are submitted . . . . Where it is clear from the record, namely from the order itself, that the additional materials were not considered by the trial court, the . . . motion is not converted into a Rule 56 motion." (internal quotation marks, brackets, and citation omitted).)

## IV.  ANALYSIS

22.      SELC bases its claim for relief on the Public Records Act, N.C.G.S. §§ 132-1–132-10.  The Act provides "[e]very custodian of public records shall permit any record in the custodian's custody to be inspected and examined at reasonable times and under reasonable supervision[.]"  *Id.* § 132-6.  The public policy underlying the Act is set out in Section 132-1(b) as follows:

> The public records and public information compiled by the agencies of North Carolina government or its subdivisions are the property of the people. Therefore, it is the policy of this State that the people may obtain copies of their public records and public information free or at minimal cost unless otherwise specifically provided by law. As used herein, "minimal cost" shall mean the actual cost of reproducing the public record or public information.

*Id.* § 132-1(b).

23.      Public records, for purposes of the Act, are defined as:

> all documents, papers, letters, maps, books, photographs, films, sound recordings, magnetic or other tapes, electronic data-processing records, artifacts, or other documentary material, regardless of physical form or characteristics, made or received pursuant to law or ordinance in connection with the transaction of public business by any agency of North Carolina government or its subdivisions.

*Id.* § 132-1(a).

24.      Within this definition, an "[a]gency of North Carolina government or its subdivisions . . . mean[s] and include[s] every public office, public officer or official (State or local, elected or appointed), institution, board, commission, bureau, council, department, authority, or other unit of government of the State or of any county, . . . or other political subdivision of government."  *Id.*

25. Any person who is denied access to public records for purposes of inspection and examination may bring an action against the entity withholding the records seeking an order compelling disclosure of the documents. *Id.* § 132-9(a). Actions brought pursuant to Section 132-9 "shall be set down for immediate hearing, and subsequent proceedings in such actions shall be accorded priority[.]" *Id.*

26. The Motion, which targets SELC's action brought pursuant to Section 132-9, is accordingly considered and decided on an expedited basis. The Court first addresses the procedural filing of the Motion and then addresses Defendants' substantive arguments raised therein.

A. **The Motion is procedurally defective, but nonetheless may be considered by the Court**

27. As a preliminary matter, SELC contends that the Motion should be denied because it is procedurally defective. (Pl.'s Resp. to Defs.' Mot. for J. on Pleadings 4, ECF No. 15 ["Opp'n Br."].) The record demonstrates that Defendants filed the Motion one minute before filing their Answer. Rule 12(c) expressly provides that a motion under the Rule may be filed *after* the pleadings are closed. As a result, SELC submits that the Court should not consider the Motion. (Opp'n Br. 4–5.)

28. The Court agrees with SELC that the Motion is untimely. Even one minute before the filing of Defendants' Answer means that the Motion was filed before the pleadings were closed, and thus the Motion can be denied on that basis. However, the Court believes it is appropriate, notwithstanding Defendants' procedural misstep, to consider the Motion on its merits because Defendants would not be legally foreclosed from re-filing the Motion following denial for this procedural irregularity.

In the interests of judicial efficiency, and because SELC contends its principal aim is to quickly obtain the documents sought (as is required by Section 132-9(a)), the Court exercises its discretion and chooses to decide the Motion as if it were timely filed.[2]

B.    **The allegations in the Complaint are not "facially deficient" and the inquiry before the Court is fact-intensive and therefore incapable of resolution on a Rule 12(c) motion**

29.    Having carefully reviewed the Complaint, Answer, the Motion, and the briefs submitted by the parties in support of and opposition to the Motion, the Court now turns to the substantive merits of the Motion.  Both sides acknowledge that our Court of Appeals' decision in *News & Observer Publishing Co. v. Wake County Hospital System, Inc.*, 55 N.C. App. 1, 284 S.E.2d 542 (1981) is relevant to the Court's consideration of the Motion but disagree as to its specific effect.

30.    In *News & Observer*, an appeal from an order granting summary judgment by the trial court compelling disclosure, the Court of Appeals was required to answer for the first time when a corporate entity qualifies as an "agency" of the State or a county for purposes of the Public Records Act.  *See id.* at 8, 284 S.E.2d at 546.  The plaintiff newspaper company in that case sought an order compelling the Wake County Hospital System (the "Hospital System") to reveal terms of settlements reached in three actions brought by former employees against the Hospital System for wrongful termination and to reveal expense account records maintained by the Hospital System.  *Id.* at 3, 284 S.E.2d at 544.  In order for the Court of Appeals to

---

[2] At the hearing of this matter on September 10, 2019, in response to inquiry by the Court, counsel for SELC made clear that SELC wanted the Court to consider the Motion on its merits rather than deny the motion based on Defendants' filing irregularity only for the Court to thereafter consider a renewed motion under Rule 12(c) raising the same arguments.

determine whether the trial court correctly compelled production of the records in question, it had to answer two questions: (1) whether the trial court was correct in concluding that the Hospital System was an agency of North Carolina government or one of its subdivisions (namely, Wake County) within the meaning of the Public Records Act; and (2) if so, whether the records sought by the newspaper were public records subject to the Act. *Id.* at 7, 284 S.E.2d at 546.

31.     In answering the first question, which is also the question asked of this Court on the instant Motion, the appellate court concluded that "Wake County's supervisory responsibilities and control over the [Hospital] System [were] manifest" and its "ties to the county lead . . . to the inescapable conclusion that the [Hospital] System exercised its 'independent authority' so intertwined with the county that it must, and is, an 'agency of North Carolina government or its subdivision;' i.e., Wake County." *Id.* at 11, 12, 284 S.E.2d at 548, 549.

32.     In reaching this conclusion, the appellate court considered a variety of factors, including: (i) that upon dissolution, the Hospital System's assets were to be transferred to Wake County; (ii) that all vacancies on the board of directors were subject to approval by the county commissioners; (iii) that the Hospital System occupied premises owned by the county virtually rent-free; (iv) that the county commissioners reviewed and approved the Hospital System's annual budget; (v) that the county audited the Hospital System's books and records; (vi) that the Hospital System reported its charges and rates to the county; (vii) that the Hospital System was financed by county bond orders; (viii) that revenue collected pursuant to the bond

orders was to be considered revenue of the county; and (ix) that the Hospital System would not change its corporate existence or amend its articles of incorporation without the county's written consent. *Id.* at 11, 284 S.E.2d at 548–49. The appellate court also considered the fact that the Hospital System was performing an important "public and governmental" function. *Id.* at 11–12, 284 S.E.2d at 549.

33. These factors, however, were not intended to be an exclusive list for our courts in determining when a corporate entity is properly considered an "agency" subject to the Public Records Act. *Id.* at 11, 284 S.E.2d at 548. In fact, the Court of Appeals made it clear in *News & Observer*, which it reinforced in a subsequent appellate decision thereafter, that "each new arrangement must be examined anew and in its own context" when determining whether a corporate entity may also be considered an agency of the government for purposes of the public records statutes. *Id.*; *see also Chatfield v. Wilmington Hous. Fin. & Dev., Inc.*, 166 N.C. App. 703, 707–08, 603 S.E.2d 837, 840 (2004).

34. In *Chatfield*, the Court of Appeals considered the nine factors laid out by the *News & Observer* Court. The court there recognized, however, that the ultimate question before the Court was the degree of "'supervisory responsibilities and control' over a corporate entity for such an entity to qualify as a government agency and fall within the ambit of the Public Records Law." *Chatfield*, 166 N.C. App. at 708–09, 603 S.E.2d at 840 (quoting *News & Observer Pub. Co.*, 55 N.C. App. at 11, 284 S.E.2d at 548).

35. The Court, considering the analyses undergone by our appellate courts in *News & Observer* and *Chatfield*, agrees with SELC in its opposition to the Motion that a decision regarding the applicability of the Public Records Act is necessarily fact-intensive and thus is generally "ill-suited for resolution on the pleadings pursuant to Rule 12(c)." (Opp'n Br. 2.) SELC's Complaint alleges facts, taken as true for purposes of determining the Motion, that could weigh in favor of the Court finding the NCRR an "agency" of the State for purposes of the Public Records Act. Allegations potentially supportive of such a conclusion, include, for example: (i) the NCRR's assets upon dissolution will be transferred to the State; (ii) the Governor of North Carolina and the General Assembly appoint all members of the NCRR Board of Directors; (iii) the NCRR is required to provide annual reports to the legislature which go above and beyond what is required for other corporate entities; and (iv) the NCRR has the power of eminent domain.

36. Moreover, the *News & Observer* Court based its decision, in part, on the fact that the Hospital System was performing an important "public and governmental" function. 55 N.C. App. at 11–12, 284 S.E.2d at 549. Likewise, here, SELC has alleged that the NCRR's stated mission is to work for the "good of the people of North Carolina[,]" (Compl. ¶ 31), and to manage a railroad corridor for the benefit of North Carolina citizens, (Compl. ¶ 32).

37. SELC's allegations are, in part, supported by statute and other legislative documents, and given the similarities to the Hospital System in *News & Observer*, the legal claims made by SELC cannot be rejected on their face. Thus, based on the

record before it, the Court cannot conclude as a matter of law that the NCRR cannot be an "agency" of the State for purposes of the Public Records Act. Rather, this inquiry will require the Court to weigh factors similar to those addressed in *News & Observer*, but also other, context-specific factors that may arise upon a more fully developed record.

38. Despite the foregoing allegations, Defendants posit that the facts of this case are fundamental different from the facts of *News & Observer*. Defendants argue that the State's degree of control over the NCRR is no different from the degree of control any majority or sole shareholder of a corporation would have over the entity it owns a controlling interest in. (Br. in Supp. Mot. for J. on Pleadings 2–3, ECF No. 8 ["Supp. Br."].) Indeed, they argue, "NCRR acts as any other private corporation and exercises the same rights, duties, and responsibilities under Chapter 55 of the North Carolina General Statutes governing private corporations." (Supp. Br. 2.)

39. In support of this position, Defendants cite *Southern Railway Co. v. North Carolina Railroad Co.*, wherein a federal district court found in 1897 that the State of North Carolina "laid down her sovereignty" when the State became a shareholder of a private corporation. 81 F. 595, 600 (N.C. 1897). There, the court concluded that the state's sovereignty did not extend to a corporation which it controlled (as the owner of three-fourths of the company's stock). *Id.* at 599–600.

40. Upon review of this case, the Court finds it distinguishable. The issue before the court there was whether the private corporation could benefit from the State's majority interest in the entity by invoking protections only available to the

State (i.e. sovereign immunity). That is admittedly different from the issue before this Court, which involves the degree of control the State has over the NCRR above and beyond its status as a shareholder.

41. Defendants may in fact be correct that the State's status as a shareholder does not, in and of itself, make the entity an "agency" of the State. But that is not what SELC is arguing here. In fact, SELC has alleged that the State's involvement with the NCRR is beyond the level of involvement that an ordinary majority shareholder would have in a corporation. As stated above, SELC has alleged that the NCRR has been given the power of eminent domain, (Compl. ¶ 49), has reporting requirements set by statute that go above and beyond what is required for other private corporations, (Compl. ¶ 59(a)–(k)), and that "Saylor and NCRR staff are in frequent communication with officers and employees of the State of North Carolina[,]" (Compl. ¶ 59(n)), which may include employees that are not on the Board of Directors. The Court, therefore, believes that *Southern Railway* is not controlling, and that, instead, the Court must concentrate its analysis on the factors and reasoning set forth in *News & Observer* and *Chatfield*—the two appellate cases that directly involve a corporation's obligations, if any, to turn over their records pursuant to Section 132-1(a).

42. The Court also notes that Defendants attach to their Answer the Evaluation Report on the NCRR published by the General Assembly's Program Evaluation Division, which pronounced therein that the NCRR is not part of state government. (Evaluation Report 9.) This Evaluation Report was cited in the

Complaint, and therefore is properly before the Court on the Motion. *See Weaver*, 187 N.C. App. at 205, 652 S.E.2d at 708. Defendants also argue that "throughout its 170-year history, the NCRR has never been considered a public agency of the State by the [Executive and Legislative] branches." (Supp. Br. 7.) In considering the Evaluation Report and Defendants' arguments thereto, the Court concludes that while the legislature's and the Attorney General's pronouncements may ultimately support a conclusion that the NCRR and its officers and directors are not subject to the Public Records Act, these formal statements, to the extent properly considered by the Court on the Motion, are not conclusive of the issue at this stage of the proceedings. Rather, the Court concludes that, in the absence of an express legislative enactment that the NCRR and its leadership are exempt from the Public Records Act, the Court must permit this action to proceed, subject to later motions practice or trial based on a more complete factual record.

43. Lastly, the Court's decision to deny the Motion is based in part on the wording of the NCRR Charter, which declares that the NCRR shall have a "corporate existence as a body politic in perpetuity." *News & Observer*, as well as other cases cited therein, discuss the effect a corporation's creation by enactment of the legislature as a "body politic" has on the court's "agency" determination. *News & Observer Pub. Co.*, 55 N.C. App. at 9–11, 284 S.E.2d at 547–48; *see also Sides v. Cabarrus Memorial Hosp., Inc.* 287 N.C. 14, 18, 213 S.E.2d 297, 300 (1975).

44. This Court recently found the language "body corporate and politic" to be an important factor, along with the power of eminent domain, in concluding a

corporation was a quasi-municipal corporation and thus a governmental agency. *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2019 NCBC LEXIS 14, at \*17 (N.C. Super. Ct. Feb. 27, 2019) ("'Body politic' has been interpreted by our Supreme Court to 'connote[ ] a body acting as a government, i.e. exercising powers which pertain exclusively to a government, as distinguished from those possessed also by a private individual or a private association.'" (quoting *Student Bar Ass'n Bd. of Governors v. Byrd*, 293 N.C. 594, 601, 239 S.E.2d 415, 420 (1977))).

45. Defendants contend that all corporations were enacted by an act of the legislature in the 1840s, and that this defeats the effect of the statutory language defining the NCRR as a "body politic."[3] Defendants provide no support for this proposition, and the Court, upon its own review of the numerous statutory enactments by the State legislature during its 1848–49 session, has not found conclusive support that the legislature enacted all corporations at that time as "body corporate and politic" (or any related terminology) despite its intention for those corporations to exist independent of the State. This begs the question, therefore, whether the language "body politic" appearing in the NCRR Charter is dispositive, or otherwise strongly suggestive, of the legislature's intention that the NCRR be considered an agency of the State for purposes of our public records statutes, despite any evidence to the contrary.

---

[3] Defendants also cite two North Carolina appellate cases for the proposition that our Courts have long recognized the NCRR as a private corporation. *See State v. Richmond & D.R. Co.*, 73 N.C. 527, 533 (1875); *Werner v. Alexander*, 130 N.C. App. 435, 436, 502 S.E.2d 897, 898 (1998). The Court has reviewed both cases and finds the relevant language either *dicta* or distinguishable from the facts and relevant inquiry before the Court at this time.

46. Accordingly, the Court concludes that SELC's position taken in the Complaint is not factually deficient and that this matter is incapable of resolution on the pleadings.

## V.    CONCLUSION

47. For the foregoing reasons, the Court hereby **DENIES** the Motion.

**SO ORDERED**, this the 11th day of September, 2019.

/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
 for Complex Business Cases